# Vance Decl. Ex. 1

Frequently Asked Questions

## VENEZUELA SANCTIONS

### 505. If an official of the Government of Venezuela is designated as a Specially Designated National (SDN), does that mean that the Government of Venezuela is blocked? What are the prohibitions on U.S. persons dealing with a designated government official?

No. The designation of an official of the Government of Venezuela does not mean that the government itself is also blocked. The prohibitions apply to transactions or dealings only with the individuals and entities whose property and interests in property are blocked. However, U.S. persons should be cautious in dealings with the government to ensure that they are not engaged in transactions or dealings, directly or indirectly, with an SDN, for example by entering into contracts that are signed by an SDN, entering into negotiations with an SDN, or by processing transactions, directly or indirectly, on behalf of the SDN, absent authorization or an applicable exemption.

07/19/2018

### 507. For purposes of Executive Order (E.O.) 13808 is Petroleos de Venezuela, S.A. (PdVSA) considered part of the Government of Venezuela?

Yes, but prohibitions on dealing in new debt vary based on whether the entity involved is a PdVSA entity or another part of the Government of Venezuela. Subsection 1 (a)(i) of E.O. 13808 prohibits engaging in transactions related to, providing financing for, or otherwise dealing in debt if (1) that debt is issued on or after the sanctions effective date ("new debt"); (2) has a maturity of longer than 90 days; and (3) is issued by, on behalf of, or for the benefit of PdVSA, its property, or its interests in property. Subsection 1 (a)(ii) of E.O. 13808 prohibits engaging in transactions related to, providing financing for, or otherwise dealing in new debt with a maturity of longer than 30 days issued by, on behalf of, or for the benefit of any other segment of the Government of Venezuela, its property, or its interests in property. Subsection 1(a)(ii) of E.O. 13808 further prohibits engaging in transactions related to, providing financing for, or otherwise dealing in equity issued on or after the sanctions effective date ("new equity") by, on behalf of, or for the benefit of the Government of Venezuela (including PdVSA), its property, or its interests in property

07/19/2018

### 508. What do the prohibitions in Executive Order (E.O) .13808 mean? Are they blocking actions?

No. E.O. 13808, as amended by E.O. 13857, does not authorize the blocking of property. E.O. 13808, however, should be read in conjunction with other Venezuela-related authorities, such as the E.O. 13884, which blocks the Government of Venezuela, and E.O. 13850, as amended, under which certain Government of Venezuela entities, including Petróleos de Venezuela, S.A. (PdVSA), are designated.

Subsection 1(a)(i) of E.O. 13808 prohibits engaging in transactions related to, providing financing for, or otherwise dealing in debt issued on or after August 25, 2017, with a maturity of longer than 90 days and issued by, on behalf of, or for the benefit of PdVSA, its property, or its interests in property.

Subsection 1(a)(ii) of E.O. 13808 prohibits engaging in transactions related to, providing financing for, or otherwise dealing in debt issued on or after August 25, 2017, with a maturity of longer than 30 days and issued by, on behalf of, or for the benefit of any other segment of the Government of Venezuela, its property, or its interests in property. That subsection further prohibits engaging in transactions related to, providing financing for, or otherwise dealing in equity issued on or after August 25, 2017, and issued by, on behalf of, or for the benefit of the Government of Venezuela (including PdVSA), its property, or its interests in property.

Subsection 1(a)(iii) of E.O. 13808 prohibits engaging in transactions related to, providing financing for, or otherwise dealing in bonds issued by the Government of Venezuela prior to August 25, 2017.

Subsection 1(a)(iv) of E.O. 13808 prohibits engaging in transactions related to, providing financing for, or otherwise dealing in dividend payments or other distributions of profits to the Government of Venezuela by any entity owned or controlled, directly or indirectly, by the Government of Venezuela.

Section 1(b) of E.O. 13808 prohibits purchasing any securities from the Government of Venezuela other than securities issued on or after August 25, 2017, with a maturity of less than or equal to 90 days (for PdVSA) or 30 days (for the rest of the Government of Venezuela).

E.O. 13808 prohibits transactions by U.S. persons wherever they are located, and transactions within the United States. For transactions involving blocked persons, including the Government of Venezuela and any entity in which it owns, directly or indirectly, a 50 percent or greater interest, U.S. persons are prohibited from engaging in any activity or transaction with such blocked persons unless exempt or otherwise authorized by OFAC. If there is a Venezuela-related general license authorizing dealings with such blocked persons, but the transactions or dealings fall within the prohibitions of E.O. 13808, U.S. persons should reject such transactions, unless an authorization allowing transactions and other dealings otherwise prohibited by E.O. 13808 also applies. U.S. persons must report to OFAC any blocked or rejected transactions within 10 business days.

08/06/2019

---

### 509. Is there a wind-down or safe harbor provision for the prohibitions in Executive Order (E.O.) 13808?

General License 1, which expired on September 25, 2017, provided a wind-down period with respect to contracts and other agreements that were in effect prior to August 25, 2017. That general license provided 30 days in which to conduct all transactions and activities otherwise prohibited by Subsections 1(a)(i)-(iii) and (b) of

E.O.13808 that were ordinarily incident and necessary to winding down such agreements.There is no wind-down authorization for Subsection 1(a)(iv) of E.O. 13808

07/19/2018

---

### 510. Has OFAC issued general licenses related to Executive Order (E.O.) 13808?

OFAC has issued four general licenses related to E.O.13808 . General License 1, which expired on September 25, 2017, applied to contracts and other agreements that were in effect prior to August 25, 2017. It provided 30 days in which to conduct all transactions and activities otherwise prohibited by Subsections 1 (a)(i)-(iii) and (b) of E.O. 13808 that were ordinarily incident and necessary to winding down such agreements.

General License 2 authorizes all transactions otherwise prohibited by Subsections 1(a)(i), (a)(ii), and (b) of E.O.13808 provided that the only Government of Venezuela entities involved in the transactions are CITGO Holding, Inc. and any of its subsidiaries.

General License 3    authorizes all transactions related to, the provision of financing for, and other dealings in bonds contained in the Annex to General License 3 that would otherwise be prohibited by Section 1(a)(iii) of E.O. 13808. The Annex is also available as a stand-alone document on the Venezuela-related Sanctions page of OFAC's website. General License 3 further authorizes all transactions related to, the provision of financing for, and other dealings in bonds issued prior to August 25, 2017, if such bonds were issued by U.S. person entities owned or controlled, directly or indirectly, by the Government of Venezuela, such as CITGO Holding, Inc.

General License 4    authorizes all transactions related to the provision of financing for, and other dealings in debt issued on or after August 25, 2017 related to the exportation or reexportation of agricultural commodities, medicine, medical devices, or replacement parts and components for medical devices, to Venezuela, or to persons in third countries purchasing specifically for resale to Venezuela, provided that the exportation or reexportation is licensed or otherwise authorized by the Department of Commerce.

All of the general licenses are available on OFAC's website on the Venezuela-related Sanctions page. Review them for details.

07/19/2019

---

### 511. For purposes of Executive Order (E.O.) 13808, what does OFAC interpret to be debt and equity? Can U.S. financial institutions continue to maintain correspondent accounts and process U.S. dollar-clearing transactions for the entities subject to these sanctions?

The term debt includes bonds, loans, extensions of credit, loan guarantees, letters of credit, drafts, bankers acceptances, discount notes or bills, or commercial paper. The term equity includes stocks, share issuances, depositary receipts, or any other evidence of title or ownership.

The prohibitions in Subsections 1(a)(i) of E.O. 13808    apply to all transactions involving debt issued on or after August 25, 2017, with a maturity of longer than 90 days; all financing in support of such new debt; and any dealing in, including provision of services in support of, such new debt.

The prohibitions in Subsections 1(a)(ii) of E.O.13808 apply to all transactions involving debt issued on or after August 25, 2017, with a maturity of longer than 30 days or equity issued on or after August 25, 2017; all financing in support of such new debt or new equity; and any dealing in, including provision of services in support of, such new debt or new equity.

These E.O. 13808 prohibitions extend to rollover of existing debt, if such rollover results in the creation of new debt with a maturity of longer than 90 days (with respect to PdVSA debt) or longer than 30 days (with respect to the rest of the Government of Venezuela debt).

Engaging in transactions related to, providing financing for, or otherwise dealing in any equity issued by, on behalf of, or for the Government of Venezuela is permissible, if the equity was issued prior to August 25, 2017 and the transactions, financing, or other dealings are not prohibited by any other Venezuela-related E.O. or other applicable laws or regulations.

Engaging in transactions related to, providing financing for, or otherwise dealing in any debt issued by, on behalf of, or for the Government of Venezuela is permissible if the debt was issued prior to August 25, 2017, and, in the case of bonds, either (1) the bonds are included in the Annex to General License 3, or (2) the bonds were issued by U.S. person entities owned or controlled, directly or indirectly, by the Government of Venezuela (such as CITGO Holding,

Inc.). The Annex to General License 3 is available as a stand-alone document on the Venezuela-related Sanctions page of OFAC's website. The list will also be published in the Federal Register, as will any changes to the list.

E.O. 13808 prohibits U.S. persons from purchasing securities of any kind – including debt and equity securities – from the Government of Venezuela. The exception to this prohibition is purchasing securities that qualify as (a) debt of PdVSA issued on or after August 25, 2017, with a maturity of less than or equal to 90 days, or (b) debt of any other part of the Government of Venezuela issued on or after August 25, 2017, with a maturity of less than or equal to 30 days. U.S. persons may deal with the Government of Venezuela as counterparty to transactions involving securities that fall into either of these two categories. U.S. persons are not authorized to purchase, directly or indirectly, bonds in the Annex to General License 3 from the Government of Venezuela.

Unlike the debt-related prohibitions of E.O. 13808, which address certain debt of the Government of Venezuela, including PdVSA, the debt-related provisions of E.O. 13835     address debt that is owed to the Government of Venezuela. The prohibitions in Subsections 1(a)(i) and (ii) of E.O. 13835 apply to all transactions related to, provision of financing for, and other dealings in (i) the purchase of any debt owed to the Government of Venezuela, including accounts receivable, and (ii) any debt owed to the Government of Venezuela that is pledged as collateral after May 21, 2018, including accounts receivable, respectively.

The equity-related prohibition in Subsection 1(a)(iii) of E.O. 13835 applies to any sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest; and any dealing in, including provision of services in support of, such transactions.

U.S. financial institutions may continue to maintain correspondent accounts and process U.S. dollar-clearing transactions for the Government of Venezuela, so long as those activities do not involve engaging in transactions prohibited by E.O. 13692 or any subsequent Venezuela-related E.O., or other applicable laws or regulations.

07/19/2018

---

## 512. Why is OFAC imposing sanctions and issuing general licenses specific to bonds and other securities?

The Government of Venezuela is selling assets for much less than they are worth at the expense of the Venezuelan people and using proceeds from these sales to enrich supporters of the regime. Bonds and other securities are among the assets being sold. The prohibitions and related general licenses are meant to prevent U.S. persons from contributing to the Government of Venezuela's corrupt and shortsighted financing schemes while mitigating market disruptions and harm to investors.

08/25/2017

---

## 513. Do the prohibitions imposed pursuant to E.O. 13808 and subsequent Venezuela-related E.O.s also extend to entities owned 50 percent or more by the Government of Venezuela?

In general, yes. These prohibitions apply to transactions related to the Government of Venezuela, which is defined in E.O. 13808     to include all entities owned or controlled by the Government of Venezuela. This would normally include entities owned 50 percent or more by the Government of Venezuela because in most instances such entities would be considered controlled by the Government of Venezuela. Also included are any entities that are less than 50% owned, but otherwise controlled, by the Government of Venezuela. Note, however, that General License 2 authorizes all transactions otherwise prohibited by Subsections 1(a)(i), (a)(ii), and (b) of E.O. 13808 provided that

the only Government of Venezuela entities involved in the transactions are CITGO Holding, Inc. or its subsidiaries. General License 3 also authorizes all transactions related to, provision of financing for, and other dealings in bonds issued prior to August 25, 2017, by U.S. person entities owned or controlled, directly or indirectly, by the Government of Venezuela.

07/19/2018

---

### 514. If a U.S. person entered into a revolving credit facility or long-term loan arrangement for the Government of Venezuela prior to the sanctions effective date, what are the restrictions under E.O. 13808 on drawdowns from that facility? Do all drawdowns and disbursements pursuant to the parent agreement need to carry repayment terms of 90 days or less (for PdVSA) or 30 days or less (for the rest of the Government of Venezuela)?

If a U.S. person entered into a long-term credit facility or loan agreement prior to August 25, 2017, drawdowns and disbursements with repayment terms of 90 days or less (for PdVSA) or 30 days or less (for the rest of the Government of Venezuela) are not prohibited. Drawdowns and disbursements whose repayment terms exceed the applicable authorized tenor are also not prohibited if the terms of such drawdowns and disbursements (including the length of the repayment period, the interest rate applied to the drawdown, and the maximum drawdown amount) were contractually agreed to prior to August 25, 2017, and are not modified on or after August 25, 2017. U.S. persons may not deal in a drawdown or disbursement initiated after August 25, 2017 with a repayment term of longer than 90 days (for PdVSA) or 30 days (for the rest of the Government of Venezuela), if the terms of the drawdown or disbursement were negotiated on or after August 25, 2017. Such a newly negotiated drawdown or disbursement would constitute a prohibited transaction related to new debt under E.O. 13808          .

Note that General License 2          authorizes all transactions in new debt of the Government of Venezuela of any tenor provided that the only Government of Venezuela entities involved in the transactions are CITGO Holding, Inc. and any of its subsidiaries.

07/19/2018

---

### 515. For purposes of Executive Order (E.O.) 13808 is the term "new equity" limited to equity that is issued by an entity owned or controlled by the Government of Venezuela after the sanctions effective date, or would equity purchased or acquired by an entity owned or controlled by the Government of Venezuela from a third party after the sanctions effective date be considered new equity?

Under E.O. 13808          , the term "new equity" pertains to equity issued, directly or indirectly, by the Government of Venezuela on or after August 25, 2017. That said, E.O. 13808 also prohibits U.S. persons from purchasing any securities – including equity securities issued by a non-sanctioned party – from the Government of Venezuela. The exception to this prohibition is purchasing securities that qualify as (1) debt of PdVSA issued on or after August 25, 2017, with a maturity of less than or equal to 90 days, or (2) debt of any other part of the Government of Venezuela issued on or after August 25, 2017, with a maturity of less than or equal to 30 days. U.S. persons are not prohibited from dealing with the Government of Venezuela as counterparty to transactions involving securities that fall into either of these two categories. General License 2 authorizes U.S. persons to deal in such new equity issued by CITGO Holding, Inc. or any of its subsidiaries, or to purchase securities from CITGO Holding, Inc. or any of its subsidiaries, provided that no other entities owned or controlled by the Government of Venezuela are involved.

07/19/2018

---

### 516. Does the prohibition in E.O. 13808 on "dealing in new debt" of longer than 90 days maturity (for PdVSA) or 30 days (for the rest of the Government of Venezuela) prohibit dealing in debt with maturity that exceeds the applicable authorized tenor in which the Government of Venezuela is not directly or indirectly the borrower?

E.O.13808      prohibits U.S. persons from dealing in debt of longer than 90 days maturity (for PdVSA) and longer than 30 days maturity (for the rest of the Government of Venezuela) issued on or after August 25, 2017. E.O. 13808 does not prohibit U.S. persons from dealing with the Government of Venezuela as counterparty to most transactions involving debt issued on or after August 25, 2017 by a non-sanctioned party. For example, under E.O. 13808, U.S. persons are not prohibited from dealing with the Government of Venezuela when it plays the role of underwriter on new debt of a non-sanctioned third party exceeding the applicable authorized tenor or accepting payment under a letter of credit with terms exceeding the applicable authorized tenor that is issued, advised, or confirmed by the Government of Venezuela, so long as the Government of Venezuela is not the borrower.

07/19/2018

---

### 517. For the purposes of Executive Order (E.O. 13808) may a U.S. person consent to a replacement of its participation by a non-U.S. person in a long-term loan facility that was extended to the Government of Venezuela prior to the sanctions effective date?

E.O.13808      does not prohibit a U.S. person from engaging in transactions necessary to exit or replace its participation in a long-term loan facility that was extended to the Government of Venezuela prior to August 25, 2017, provided that such transactions do not otherwise run afoul of the order's prohibitions. This would not constitute dealing in new debt. However, U.S. persons involved in such facilities should ensure that all newly negotiated drawdowns or disbursements from the facility utilize repayment terms that are not prohibited by E.O. 13808. See FAQ 394 for additional information on what constitutes a permitted drawdown or disbursement from an existing long-term loan obligation.

07/19/2018

---

### 518. Is a U.S. person permitted under E.O. 13808 to extend credit for greater than 90 days (for PdVSA) or 30 days (for the rest of the Government of Venezuela) to a non-sanctioned party for the purpose of purchasing goods or services from the Government of Venezuela?

E.O.13808      does not prohibit U.S. persons from extending credit for longer than 90 days (for PdVSA) or 30 days (for the rest of the Government of Venezuela) to non-sanctioned parties for the purpose of purchasing goods or services from the Government of Venezuela, so long as the Government of Venezuela is not the indirect borrower.

07/19/2018

---

### 519. How can I help the Venezuelan people while making sure to abide by the U.S. sanctions?

While E.O. 13884 blocks all property and interests in property of the Government of Venezuela that come into the possession or control of U.S. persons or U.S. jurisdiction, the Venezuelan people are not subject to comprehensive U.S. sanctions. Sanctions do not preclude U.S. persons from exporting or reexporting items to Venezuela provided that the transactions do not involve sanctioned individuals or entities or certain prohibited activities. Those involved in exports or reexports to Venezuela, including exports or reexports related to activity authorized by OFAC, should also consult the Department of Commerce's Bureau of Industry and Security to ensure eligibility of exportation or reexportation under its authorities. Likewise, the E.O. of August 5, 2019 does not prohibit transactions involving the Government of Venezuela that relate to the provision of articles such as food, clothing, and medicine intended to be used to relieve human suffering. OFAC has also issued General License 4C to authorize further transactions ordinarily incident and necessary to the exportation or reexportation of agricultural commodities, medicine, medical devices, replacement parts and components for medical devices, or software updates for medical devices to Venezuela, or to persons in third countries purchasing specifically for resale to Venezuela. See General License 4C for details and relevant definitions.

In addition, OFAC maintains several complementary general licenses designed to support assistance to the Venezuelan people. General License 16B authorizes transactions and activities ordinarily incident and necessary to processing noncommercial, personal remittances involving certain financial institutions. General License 20A authorizes official activities of certain international organizations to engage in transactions with the Government of Venezuela. General License 24 authorizes transactions involving the Government of Venezuela incident to the receipt and transmission of telecommunications, as well as transactions of common carriers involving the Government of Venezuela incident to the receipt or transmission of mail and packages between the United States and Venezuela. General License 25 authorizes the exportation or reexportation, directly or indirectly, from the United States or by U.S. persons, wherever located, to or involving the Government of Venezuela of services, software, hardware, and technology incident to the exchange of communications over the Internet. General License 26 authorizes the provision and receipt of nonscheduled emergency medical services, and the provision of other medical services involving the Government of Venezuela. General License 29 authorizes nongovernmental organizations to engage in activities with the Government of Venezuela in support of humanitarian projects, democracy building, education, non-commercial development projects directly benefiting the Venezuelan people, and environmental protection in Venezuela.

In addition to these general licenses, OFAC can also issue specific licenses to authorize particular transactions that may otherwise be prohibited by the sanctions, as long as those transactions are in the foreign policy interests of the United States. For additional information, please see FAQ 665 and OFAC's "Guidance Related to the Provision of Humanitarian Assistance and Support to the Venezuelan People."

08/06/2019

---

### 520. Do I need a specific license from OFAC to send U.S.-origin food or medicine to Venezuela?

No, as long as your transaction or other dealing does not involve property or interests in property of a Specially Designated National. That said, you should make sure that your proposed export is authorized by the U.S. Department of Commerce, Bureau of Industry and Security ("BIS"), which maintains jurisdiction over the export of

items to Venezuela. For further guidance regarding the exportation of items to Venezuela, contact BIS by phone at (202) 482-4252.

08/25/2017

## 521. I want to provide long-term financing to the Government of Venezuela to help with the exportation or reexportation of agricultural commodities, medicine, medical devices, components, or replacement parts and components for medical devices to Venezuela. Is that allowed?

Yes. General License 4 authorizes all financing and other dealings in new debt related to the exportation or reexportation of agricultural commodities, medicine, medical devices, components, or replacement parts for medical devices, to Venezuela, or to persons in third countries purchasing specifically for resale to Venezuela, provided that the exportation or reexportation is licensed or otherwise authorized by the Department of Commerce. Note, however, that General License 4 does not otherwise authorize any transaction that is prohibited by E.O. 13808, E.O. 13692, or any part of 31 C.F.R. Chapter V.

08/25/2017

## 522. Other than through the existing general licenses, under what circumstances might U.S. persons be authorized to deal in new debt of greater than 30 or 90 days issued by the Government of Venezuela?

In the Lima Declaration of August 8, 2017, twelve countries across the Americas refused to recognize the Constituent Assembly or the laws it adopts because of its illegitimate nature, while at the same time fully backing the democratically elected National Assembly. We stand in solidarity with our friends and allies in the region. If the democratically elected Venezuelan National Assembly approved a new debt issuance by the Government of Venezuela that E.O.13808 would prohibit U.S. persons from dealing in, the United States would consider using licensing authority to allow U.S. persons to deal in the issuance.

08/25/2017

## 523. The Venezuela Government International Bond issued on December 29, 2016 (ISIN USP97475AQ39, CUSIP AM1108092) is not included in the Annex to General License 3. Is that intentional? Did OFAC intentionally exclude any other bonds from the Annex?

OFAC intentionally excluded the Venezuela Government International Bond issued on December 29, 2016 (ISIN USP97475AQ39, CUSIP AM1108092) ("the 2036 bond") from the Annex to General License 3 because available information indicates that the Government of Venezuela is both the bond's issuer and sole holder. At this time, the 2036 bond is the only bond we have identified and purposely omitted from the Annex to General License 3.

Parties who identify additional bonds that they believe should be added to the Annex to General License 3 should email OFAC at OFAC_Feedback@treasury.gov with information about the bond (including its ISIN, CUSIP, description, issuance date, maturity date, and prospectus/terms and conditions) and provide their rationale for adding it to the Annex (e.g., a party other than the Government of Venezuela holds the bond). No particular

1/24/22, 9:00 AM
U.S. Department of the Treasury
Case 1:21-cv-02684-VEC    Document 41-1    Filed 01/28/22    Page 10 of 30

characteristics or circumstances will guarantee a bond's addition to the Annex to General License 3; OFAC will evaluate each request on a case-by-case basis.

Paragraph (b) of General License 3      authorizes all transactions related to, the provision of financing for, and other dealings in bonds that were issued both (i) prior to August 25, 2017, and (ii) by U.S. person entities owned or controlled, directly or indirectly, by the Government of Venezuela. Consequently, while bonds that meet both of these criteria may not be included in the Annex to General License 3, U.S. persons are nevertheless authorized to deal in these bonds

07/19/2018

## 524. I would like to engage in derivatives transactions, including credit default swaps, related to a reference bond that is in the Annex to General License 3. Is that permitted?

Paragraphs (a) and (b) of General License 3      authorize all transactions related to, the provision of financing for, and other dealings in bonds that are either listed in the Annex to General License 3 or that were issued both (i) prior to August 25, 2017, and (ii) by U.S. person entities owned or controlled, directly or indirectly, by the Government of Venezuela ("General License 3 bonds"). Buying, selling, or otherwise dealing in a derivative that references a General License 3 bond is a transaction related to the bond itself. General License 3 therefore authorizes such purchases and sales, as well as related transactions. One corollary to this authorization is that U.S. persons are not authorized to buy, sell, or otherwise deal in derivatives that reference bonds that (i) were issued by the Government of Venezuela prior to August 25, 2017, but (ii) are not General License 3 bonds.

07/19/2018

## 527. What does OFAC consider to be "profit" under Subsection 1(a)(iv) of E.O. 13808?

For purposes of Subsection 1(a)(iv) of E.O. 13808     , "profit" is net income after taxes. For a business, this is generally total sales minus total costs and expenses. For example, transactions involving the Government of Venezuela, including PDVSA, related to payments for goods and services, taxes, or royalties are not considered "profit." Similarly, principal and interest payments related to bonds and promissory notes are not considered "distributions of profit" for purposes of Subsection 1(a)(iv) of E.O. 13808, and so that subsection does not prohibit U.S. persons from making such payments. Restrictions imposed under other subsections of E.O. 13808, however, may still apply. For example, pursuant to Subsection 1(a)(iii), U.S. persons are prohibited from dealing in principal and interest payments related to bonds that were issued by the Government of Venezuela before August 25, 2017

unless U.S. persons are authorized to deal in the relevant bonds under General License 3      .

10/03/2017

## 547. Can U.S. Persons participate in meetings about restructuring outstanding Venezuelan and PDVSA debt?

U.S. persons are generally prohibited from engaging in transactions or dealings with persons named on OFAC's SDN List, including dealing with an SDN in the context of efforts to restructure Venezuelan and Petroleos de Venezuela, S.A. (PdVSA) debt. Provided there is no SDN involvement, General License 3 authorizes U.S. persons to engage in all transactions related to bonds specified in the Annex to General License 3, including participating in negotiations

regarding such bonds. General License 3 does not authorize any transaction by a U.S. person or within the United States that involves the creation or subsequent dealing in new debt of PdVSA or debt otherwise of the Government of Venezuela with a maturity of greater than 90 days or 30 days, respectively, absent a license from OFAC. OFAC would consider license applications involving any such new debt or equity on a case-by-case basis, and base licensing determinations on the facts and circumstances of the particular application. As stated in FAQ 522, the United States government would consider using licensing authority to allow U.S. persons to deal in new debt of the Government of Venezuela approved by the democratically elected Venezuelan National Assembly.

07/19/2018

---

### 548. Subsection 1(a)(i) of E.O. 13808 prohibits U.S. persons from dealing in new debt with a maturity of greater than 90 days of PdVSA. For purposes of E.O. 13808, does the term "PdVSA" include all PdVSA subsidiaries?

Yes. For purposes of E.O. 13808, the prohibition in Subsection 1(a)(i) would apply to PdVSA and extend to all PdVSA subsidiaries, unless authorized by OFAC. Note that General License 2 authorizes certain activities involving specified PdVSA subsidiaries.

11/09/2017

---

### 553. For purposes of E.O. 13808, what is "new debt"?

OFAC considers "new debt" to be debt created on or after August 25, 2017. See FAQ 511 for examples of "debt," which includes loans and extensions of credit.

OFAC does not consider debt that was created prior to August 25, 2017 to be "new debt" for purposes of E.O. 13808 so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017. Such preexisting debt does not need to conform to the 30- or 90-day tenors imposed under E.O. 13808, and U.S. persons may collect and accept payment for such debt regardless of whether the relevant segment of the Government of Venezuela, including PdVSA, pays during the agreed-upon payment period.

02/12/2018

---

### 554. For debt created on or after August 25, 2017, are U.S. persons permitted to accept payment from PdVSA or other segments of the Government of Venezuela if payment for a debt is not received within the applicable period specified in E.O. 13808 (90 days for PdVSA, 30 days for other segments of the Government of Venezuela)?

No, absent a specific license or other authorization from OFAC. As explained in FAQ 553, debt – which includes extensions of credit for sales of goods or services – created on or after August 25, 2017 constitutes "new debt," and E.O. 13808 prohibits U.S. persons and persons within the United States from engaging in transactions related to, providing financing for, or otherwise dealing in new debt with a maturity of longer than 90 days for PdVSA or 30 days for other segments of the Government of Venezuela. Because receiving payments outside of these specified maturity periods generally constitutes a prohibited dealing in debt, U.S. persons should ensure that payment terms accord with the applicable debt prohibition.

In circumstances where PdVSA or another segment of the Government of Venezuela fails to pay a debt in full within 90 or 30 days, as applicable, U.S. persons must obtain a specific license from OFAC before accepting payment after the expiration of the applicable period.

To mitigate potential harm to U.S. persons who have not received payment related to new debt incurred by PdVSA or another segment of the Government of Venezuela within the applicable maturity period, OFAC will, on a case-by-case basis, grant specific licenses to U.S. persons to deal in the collection or receipt of such payment, provided that: (1) PdVSA or another segment of the Government of Venezuela is in debt to the applicant based on an agreement that complies with applicable sanctions requirements and prohibitions; (2) the debt is "new debt" created before March 14, 2018; (3) the relevant segment of the Government of Venezuela failed to pay its debt within the agreed-upon, authorized payment period; and (4) the transaction is not otherwise prohibited under E.O. 13808, E.O. 13692 , or any part of 31 C.F.R. Chapter V.

License applications involving circumstances that do not meet these criteria will be reviewed on a case-by-case basis with a presumption of denial, with the exception of activity that is in U.S. national security or foreign policy interests, including humanitarian-related transactions, legal services, or personal communication-related services.

Consistent with FAQ 553, debt created prior to August 25, 2017 – including extensions of credit related to goods or services provided to PdVSA or another segment of the Government of Venezuela – would not constitute "new debt," provided that the parties do not change the terms of the debt.

02/12/2018

---

### 564. For purposes of Executive Order (E.O.) 13827. Taking Additional Steps to Deal with the Situation in Venezuela" of March 19 2018, are the "petro" and "petro-gold" considered a "digital currency, digital coin, or digital token" that was issued by, for, or on behalf of the Government of Venezuela on or after January 9, 2018?

Answer: Yes.

03/19/2018

---

### 565. For purposes of E.O. 13827 "Taking Additional Steps to Deal with the Situation in Venezuela" of March 19, 2018, is Venezuela's traditional fiat currency, bolivar fuerte, considered a "digital currency, digital coin, or digital token" that was issued by, for, or on behalf of the Government of Venezuela on or after January 9, 2018?

Answer: No.

03/19/2018

---

### 566. I participated in the pre-sale for a Government of Venezuela-issued "digital currency, digital coin, or digital token" before E.O. 13827 "Taking Additional Steps to Deal with the Situation in Venezuela" of March 19, 2018, became effective. Am I

**allowed to sell, trade, use, or otherwise deal in such "digital currency, digital coin, or digital token" on or after the sanctions effective date?**

Absent authorization from OFAC, U.S. persons are prohibited from engaging in transactions related to, providing financing for, and otherwise dealing in any "digital currency, digital coin, or digital token" that was issued by, for, or on behalf of the Government of Venezuela on or after January 9, 2018. OFAC would consider license applications involving Government of Venezuela-issued "digital currency, digital coin, or digital token" on a case-by-case basis and base licensing determinations on the facts and circumstances of the particular application.

03/19/2018

### 595. What does Venezuela-related General License 5I authorize?

The President issued Executive Order (E.O.) 13835 on May 21, 2018. Subsection 1(a)(iii) of E.O. 13835 prohibits U.S. persons from engaging in transactions related to the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela (GOV) of any equity interest in an entity owned 50 percent or more by the GOV. One effect of subsection 1(a)(iii) is to require authorization before U.S. persons may engage in certain transactions regarding any equity interest in an entity owned 50 percent or more by the GOV. Subsequent to the issuance of E.O. 13835, OFAC received inquiries about how and whether subsection 1(a)(iii) of E.O. 13835 could affect the ability to enforce bondholder rights to the CITGO shares serving as collateral for the Petróleos de Venezuela, S.A. (PdVSA) 2020 8.5 percent bond. OFAC issued General License 5 on July 19, 2018, which removed E.O. 13835 as an obstacle to holders of the PdVSA 2020 8.5 percent bond gaining access to their collateral.

General License 5 was replaced and superseded by General License 5A on October 24, 2019 with a delay in the effectiveness of the authorization in the general license. Since that date, OFAC has extended the delay in effectiveness a number of times. Most recently, OFAC issued General License 5I on January 20, 2022, which further delays the effectiveness of the authorization in GL 5 until January 20, 2023. Between October 24, 2019 and January 20, 2023 (the date the authorization in General License 5I becomes effective), there is no authorization in effect that licenses against subsection 1(a)(iii) of E.O. 13835 applicable to the holders of the PdVSA 2020 8.5 percent bond. As a result, during such period, transactions related to the sale or transfer of CITGO shares in connection with the PdVSA 2020 8.5 percent bond are prohibited, unless specifically authorized by OFAC.

To the extent an agreement may be reached on proposals to restructure or refinance payments due to the holders of the PdVSA 2020 8.5 percent bond, additional licensing requirements may apply. OFAC would encourage parties to apply for a specific license and would have a favorable licensing policy toward such an agreement.

01/20/2022

### 596. Does E.O. 13835 prohibit me from attaching and executing against assets of the Government of Venezuela, including vessels, properties, or financial assets, if I have a legal judgment against the Government of Venezuela?

No, provided that the attachment does not involve (i) debt owed to the Government of Venezuela (including accounts receivable) that was pledged as collateral after the effective date of E.O. 13835 (per subsection 1(a)(ii) of the E.O.), or (ii) an equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest (per subsection 1(a)(iii) of the E.O.). OFAC authorization would likely be required for attachment of equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest. OFAC would consider license applications seeking to attach and execute against such equity interests on a case-by-case basis.

07/19/2018

---

### 628. What is the objective of Executive Order (E.O.) 13850 of November 1, 2018, "Blocking Property of Additional Persons Contributing to the Situation in Venezuela"?

E.O. 13850     is designed to counter rampant corruption within the Government of Venezuela, which continues to exacerbate the economic and humanitarian crises afflicting the Venezuelan people. As we have worked to disrupt the Government of Venezuela's sources of corrupt patronage, the Maduro regime has sought new means by which to enrich itself at the expense of its people. By issuing this E.O., the U.S. government is acting to prevent the regime and its corrupt associates from further exploiting Venezuela's people and resources. The E.O. provides a powerful tool to impose costs on those who unjustly benefit from dishonest or fraudulent conduct, illicit activity, and/or deceptive transactions within Venezuela's gold sector or other identified sectors, or in relation to the Government of Venezuela or its projects or programs.

11/01/2018

---

### 629. Executive order (E.O.) 13850 of November 1, 2018, "Blocking Property of Additional Persons Contributing to the Situation in Venezuela," authorizes the imposition of sanctions on persons operating in Venezuela's gold sector. For purposes of this E.O., how will OFAC target those who "operate in the gold sector of the Venezuela economy or any other sector of the Venezuela economy as may be determined by the Secretary of the Treasury in consultation with the Secretary of State"?

OFAC expects to use its discretion to target in particular those who operate corruptly in the gold or other identified sectors of the Venezuela economy, and not those who are operating legitimately in such sectors. This includes, for example, persons engaging in dishonest or fraudulent conduct, illicit activity, or deceptive transactions within Venezuela's gold sector or other identified Venezuela sectors, with the purpose or effect of misappropriating Venezuelan resources in those sectors for personal, professional, or political gain.

11/01/2018

---

### 649. What does Executive Order 13857 of January 25, 2019 "Taking Additional Steps to Address the National Emergency with Respect to Venezuela" do and how does this impact OFAC's Venezuela-related sanctions?

Executive Order 13857     of January 25, 2019 "Taking Additional Steps to Address the National Emergency with Respect to Venezuela" broadens the definition of the term "Government of Venezuela" to include persons that have acted, or have purported to act, on behalf of the Government of Venezuela, including members of the Maduro regime, for purposes of Executive Orders 13692   , 13808   , 13827   , 13835   , and 13850   . All existing Venezuela-related sanctions remain in effect.

01/28/2019

---

**650. What is the expected level of due diligence associated with ensuring that transfers or divestment of debt (and, in the case of Venezuela-related General License 9B, equity) in certain blocked persons (in the case of General License 9B) or the Government of Venezuela (in the case of General License 3C) are consistent with the terms of General Licenses 3C and 9B?**

Paragraph (a) of General License 9B requires that any divestment or transfer by U.S. persons of debt of, or equity in, Petróleos de Venezuela, S.A. (PdVSA) (or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest), that was issued prior to August 25, 2017, be to a non-U.S. person, absent authorization from OFAC. Similarly, paragraph (a) of General License 3C requires that any divestment or transfer by U.S. persons of holdings in the bonds listed in the Annex to General License 3C (GL 3C Bonds) be a non U.S. person, absent authorization from OFAC. General Licenses 3C and 9B also authorize U.S. persons to facilitate the transfer or divestment of such debt (and, in the case of General License 9B, debt and equity), so long as the divestment or transfer of any holdings in such debt or equity by a U.S. person is to a non-U.S. person, absent authorization from OFAC. Financial institutions or registered broker-dealers in securities may rely upon the information ordinarily available to them for purposes of conducting the activities authorized under General Licenses 3C and 9B.

Consistent with OFAC FAQ 116, if a U.S. broker or financial institution involved in a transfer or divestment of such debt (or, in the case of General License 9B, debt or equity) pursuant to paragraph (a) in either General License 3C and 9B has information in its possession leading it to know or have reason to know that the buyer is a U.S. person, then the U.S. broker or financial institution will be held responsible if it does not take appropriate steps to ensure that the trade is not consummated, absent authorization from OFAC. OFAC expects U.S. persons to conduct due diligence on their own direct customers, and OFAC will consider the totality of the circumstances surrounding the processing of the transaction to determine what, if any, enforcement action to take.

02/11/2019

---

**651. What happened to the Petróleos de Venezuela, S.A. (PdVSA) bonds, or bonds issued by any entity directly or indirectly owned 50 percent or more by PdVSA, that were previously included in the Annex to General License 3?**

Bonds issued by PdVSA or any entity in which it owns, directly or indirectly, a 50 percent or greater interest that was previously listed in the Annex to General License 3 (which has been superseded by General License 3B) are now listed in the Annex to General License 9. All Venezuela-related general licenses are provided on OFAC's website on the Venezuela-related Sanctions page.

01/31/2019

---

**652. Is it permissible for mutual funds and exchange traded funds (collectively, "funds") that are U.S. persons to buy, sell, or otherwise engage in transactions related to debt, equity, or other holdings in an entity that appears on OFAC's List of Specially Designated Nationals and Blocked Persons (SDN List), or of an entity owned 50 percent or more, individually or in the aggregate, by an individual or entity on the SDN List?**

No. A fund that is a U.S. person may not buy, sell, or otherwise engage in transactions related to debt, equity, or other holdings in blocked persons and must block such holdings, unless authorized by OFAC via general or specific license. A U.S. fund that contains such blocked holdings generally is not itself considered a blocked entity, and U.S. persons may continue to invest in the fund and the fund may continue to operate. The fund may divest itself of blocked holdings only with OFAC authorization.

01/31/2019

---

### 653. I am the manager of a Synthetic Exchange Traded Fund (ETF), which tracks a basket of debt, equity or other holdings in order to provide a return approximating the returns on that basket, but which does not actually hold the underlying debt, equity, or other holdings contained in the basket. May I continue to offer such funds, and may U.S. persons trade in shares of these funds, if the underlying basket being tracked contains holdings in an entity or entities that appear on OFAC's List of Specially Designated Nationals and Blocked Persons (SDN List), or of an entity owned 50 percent or more, individually or in the aggregate, by an individual or entity on the SDN List?

Yes, so long as the underlying basket being tracked includes less than a predominant share by value of debt, equity, or other holdings in blocked persons. U.S. and non-U.S. persons may continue to constitute, offer, and trade in funds that include only synthetic risk in debt, equity, or other holdings in blocked persons, provided the underlying basket being tracked includes less than a predominant share by value of debt, equity, or other holdings in blocked persons.

01/31/2019

---

### 654. With regard to Venezuela-related General License 11, "Authorizing Certain Activities Necessary to Maintenance or Wind Down of Operations or Existing Contracts with Petróleos de Venezuela, S.A.," are U.S. financial institutions required to reject funds transfers involving both Petróleos de Venezuela, S.A. (PdVSA) or entities owned, directly or indirectly, 50 percent or more by PdVSA, and a non-U.S. entity located in a country other than the United States or Venezuela?

General License 11 authorizes, with certain exceptions, U.S. person employees of non-U.S. entities located in a country other than the United States or Venezuela to engage in transactions and activities prohibited by Executive Order 13850 that are ordinarily incident and necessary to the maintenance or wind down of operations, contracts, or other agreements involving PdVSA or entities owned, directly or indirectly, 50 percent or more by PdVSA that were in effect prior to January 28, 2019. The authorization is valid through 12:01 a.m. eastern daylight time on March 29, 2019. In accordance with paragraph (b) of General License 11, and for purposes of activities authorized under General License 11 only, U.S. financial institutions are authorized to reject, rather than block, funds transfers that involve both PdVSA or any entity owned, directly or indirectly, 50 percent or more by PdVSA and a non-U.S. entity located in a country other than the United States or Venezuela, provided that: (i) the funds transfers originate and terminate outside the United States; (ii) the originator and the beneficiary are non-U.S. persons; (iii) the funds are not destined for a blocked account on the books of a U.S. person; and (iv) the funds transfers otherwise are effected in accordance with paragraph (c) of General License 11. U.S. financial institutions

are not required to block funds transfers meeting the conditions in paragraph (b) of General License 11, but they are prohibited from processing such transactions.

01/31/2019

---

### 655. Can U.S. persons purchase petroleum and petroleum products from Petróleos de Venezuela, S.A. (PdVSA) or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest?

Until 12:01 a.m. eastern daylight time, April 28, 2019, U.S. persons are authorized to engage in all transactions and activities that are ordinarily incident and necessary to the purchase and importation of petroleum and petroleum products from PdVSA or from entities owned 50 percent or more by PdVSA, provided that any payments to PdVSA, entities in which it owns, directly or indirectly, a 50 percent or greater interest, or other blocked persons for such purchases are made into a blocked, interest-bearing account located in the United States in accordance with 31 C.F.R. § 591.203 (unless authorized by other Venezuela-related general licenses). After the expiration of the 90-day wind-down period, as described in General License 7    and General License 12        , the purchase by U.S. persons of petroleum and petroleum products from PdVSA or any entity in which it owns, directly or indirectly, a 50 percent or greater interest will be prohibited absent authorization from OFAC (see also General License 10 and FAQ 656 authorizing the purchase of refined petroleum products by U.S. persons in Venezuela, and General License 8 authorizing purchases of petroleum and petroleum products from PdVSA or any entity in which it owns, directly or indirectly, a 50 percent or greater interest for certain listed entities that are ordinarily incident and necessary to their operations in Venezuela).

01/31/2019

---

### 656. Can U.S. persons in Venezuela purchase gasoline or other refined petroleum products from Petróleos de Venezuela, S.A. (PdVSA) or any entity in which it owns, directly or indirectly, a 50 percent or greater interest?

Yes. Venezuela-related General License 10        authorizes U.S. persons in Venezuela to purchase refined petroleum products, including gasoline, for personal, commercial, or humanitarian uses from PdVSA, or any entity in which it owns, directly or indirectly, a 50 percent or greater interest. General License 10 authorizes, among other things, purchases of refined petroleum products by U.S. commercial airlines providing passenger or cargo services in Venezuela for the purposes of fueling aircraft in Venezuela. General License 10 also would authorize purchase for use to power a means of conveyance or a household good (such as a generator) in Venezuela. General License 10, however, does not authorize U.S. persons to purchase refined petroleum products in Venezuela from PdVSA for purposes of executing a commercial transaction to resell, transfer, export, or reexport such refined petroleum products.

01/31/2019

---

### 657. I am a non-U.S. entity that purchases petroleum and petroleum products from Petróleos de Venezuela, S.A. (PdVSA) or an entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest. Am I now prohibited from purchasing petroleum and petroleum products from these companies?

Transactions to purchase petroleum and petroleum products from PdVSA or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest, and that involve U.S. persons or any other U.S. nexus (e.g., transactions involving the U.S. financial system or U.S. commodity brokers) must be wound down by April 28, 2019 pursuant to Venezuela-related General License 12 . In addition, under General License 11 , U.S. person employees and contractors of non-U.S. companies located in a country other the United States or Venezuela are authorized to engage in certain maintenance or wind-down transactions with PdVSA, or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest, through 12:01 a.m. eastern daylight time, March 29, 2019. (See FAQ 654.)

01/31/2019

---

### 658. Can U.S. persons purchase, or engage in other transactions including swaps and non-cash transactions involving the purchase or exchange of, petroleum and petroleum products, if Petróleos de Venezuela, S.A. (PdVSA) or any entity in which it owns, directly or indirectly, a 50 percent or greater interest is not directly involved in the transaction?

After 12:01 a.m. eastern daylight time, April 28, 2019, as described in Venezuela-related General License 7 and General License 12 , any transactions (including swaps and non-cash transactions) involving the purchase or exchange of petroleum or petroleum products in which PdVSA or any entity in which it owns, directly or indirectly, a 50 percent or greater interest has a direct or indirect interest will be prohibited for U.S. persons absent authorization from OFAC (see also General License 10 and FAQ 656). Prior to April 28, 2019, any funds or tangible proceeds of a swap or non-cash agreement owed to PdVSA or any entity in which it owns, directly or indirectly, a 50 percent or greater interest as a result of such purchases or exchanges must be blocked, and, in the case of blocked funds, must be placed into a blocked interest-bearing account in the United States. In the case of blocked non-cash proceeds, please reach out to OFAC for further guidance.

01/31/2019

---

### 659. Does Venezuela-related General License 12 authorize U.S. persons to export goods, services, and technology from the United States to Petróleos de Venezuela, S.A. (PdVSA) or any entity in which it owns, directly or indirectly, a 50 percent or greater interest during the wind-down period?

General License 12 authorizes, until 12:01 a.m. eastern standard time, February 27, 2019, all transactions and activities that are ordinarily incident and necessary to the wind down of operations, contracts, or other agreements that were in effect prior to January 28, 2019. This authorization includes the importation into, or the exportation from, the United States of goods, services, or technology (other than the exportation of diluents) involving PdVSA or any entity in which it owns, directly or indirectly, a 50 percent or greater interest (other than ALBA de Nicaragua (ALBANISA) or any entity in which ALBANISA owns, directly or indirectly, a 50 percent or greater interest)

01/31/2019

---

### 660. When will sanctions be lifted on Petróleos de Venezuela, S.A. (PdVSA) or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest?

The path to sanctions relief for PdVSA and its subsidiaries is through the expeditious transfer of control of the company to Interim President Juan Guaidó or a subsequent, democratically elected government that is committed to taking concrete and meaningful actions to combat corruption, restore democracy, and respect human rights. A bona fide transfer of control will ensure that the assets of Venezuela are preserved for the country's people, rather than misused and diverted by former President Nicolas Maduro. Treasury will continue to use its economic tools to support Interim President Guaidó, the National Assembly, and the Venezuelan people's efforts to restore their democracy.

01/31/2019

---

### 661. What does General License 9G authorize with respect to Petróleos de Venezuela, S.A. (PdVSA) debt and equity and what are the implications for U.S. and non-U.S. persons?

General License 9G    authorizes U.S. persons to engage in all transactions and activities prohibited by Subsection 1(a)(iii) of Executive Order (E.O.) 13808    or by E.O. 13850    , each as amended by E.O. 13857 , or by E.O. 13884    , that are ordinarily incident and necessary to dealings in any debt (including, but not limited to, the bonds listed in the Annex to General License 9G) of, or equity in, PdVSA, or any entity directly or indirectly owned 50 percent or more by PdVSA that was issued prior to August 25, 2017 (together, PdVSA Securities), provided that if a U.S. person decides to sell or transfer any interests in such debt or equity, it must sell or transfer the interests to a non-U.S. person unless otherwise authorized by OFAC. The authorization in GL 9G includes, for example, engaging in transactions related to the receipt and processing of interest or principal payments, and acting as a custodian for U.S. and non-U.S. persons' holdings in PdVSA Securities, including acting as a custodian for a non-U.S. person after that person has received PdVSA Securities from a U.S. person in a divestment transaction.

Paragraph (c) of General License 9G authorizes all transactions and activities prohibited by Subsection 1(a)(iii) of E.O. 13808 or by E.O. 13850, each as amended by E.O. 13857, or by E.O. 13884, that are ordinarily incident and necessary to facilitating, clearing, and settling trades of holdings in PdVSA Securities, provided such trades were placed prior to 4:00 p.m. eastern standard time on January 28, 2019; this authorization aims to ensure that trades that were placed prior to the imposition of blocking sanctions on PdVSA are allowed to settle in the ordinary course, irrespective of whether the sale or transfer is to a non-U.S. person.

Paragraph (d) of this general license previously authorized all transactions and activities prohibited by Subsection 1(a)(iii) of E.O. 13808 or by E.O. 13850, each as amended by E.O. 13857, or by E.O. 13884, including transactions in securities and security derivatives, that were ordinarily incident and necessary to the wind down of financial contracts or other agreements that were entered into prior to 4:00 p.m. eastern standard time on January 28, 2019, involving, or linked to, PdVSA Securities. This authorization allowed certain financial contracts and agreements that were entered into prior to the imposition of blocking sanctions on PdVSA that involved or were linked to PdVSA Securities to be wound down, including resolving the purchase and sale of securities, securities lending, repurchase agreements, and swaps and derivative contracts in securities. This authorization, which was included in prior versions of this general license, expired at 12:01 a.m. eastern daylight time on March 31, 2020. Parties may apply for a specific license to engage in activity previously authorized by paragraph (d) of General License 9G.

Paragraph (e) of General License 9G authorizes all transactions and activities prohibited by Subsection 1(a)(iii) of E.O. 13808 or by E.O. 13850, each as amended by E.O. 13857, or by E.O. 13884, that are ordinarily incident and necessary to dealings in any bonds issued by PDV Holdings, Inc., CITGO Holdings, Inc., or any of their subsidiaries, prior to August 25, 2017.

U.S. persons may continue to hold their interests in PdVSA Securities, but are subject to certain restrictions on the sale of those interests in the secondary market. General License 9G does not generally authorize U.S. persons to purchase or acquire new interests in PdVSA Securities, and as a result, such purchases are prohibited absent authorization from OFAC. However, U.S. persons may purchase or invest in PdVSA Securities pursuant to paragraph (a), as described by paragraph (f)(2), of General License 9G, provided that such transactions are ordinarily incident and necessary to the divestment and transfer of holdings in PdVSA Securities. While non-U.S. persons may continue to deal in PdVSA Securities, to the extent transactions involve U.S. persons or the U.S. financial system, such transactions must comply with the terms of General License 9G and may not involve sales of interests in such PdVSA Securities to U.S. persons (other than as set forth in GL 9G and described above) as U.S. persons are largely prohibited from purchasing such interests.

05/12/2020

---

### 662. What does General License 3H authorize with respect to Government of Venezuela debt, and what are the implications for U.S. and non-U.S. persons?

General License 3H     authorizes U.S. persons to engage in all transactions prohibited by Subsection 1(a)(iii) of Executive Order (E.O.) 13808    or by E.O. 13850    , each as amended by E.O. 13857    , or by E.O. 13884, related to, the provision of financing for, and other dealings in the bonds specified in the Annex to General License 3H (GL 3H Bonds), provided that any divestment or transfer of, or facilitation of divestment or transfer of, any holdings in such bonds be to a non-U.S. person unless otherwise authorized by OFAC. The authorization in GL 3H includes, for example, engaging in transactions related to the receipt and processing of interest or principal payments, and acting as a custodian for U.S. and non-U.S. persons' holdings in GL 3H Bonds, including acting as a custodian for a non-U.S. person after that person has received GL 3H Bonds from a U.S. person in a divestment transaction.

Paragraph (b) of General License 3H authorizes all transactions and activities prohibited by Subsection 1(a)(iii) of E.O. 13808 or by E.O. 13850, each as amended by E.O. 13857, or by E.O. 13884, that are ordinarily incident and necessary to facilitating, clearing, and settling trades of holdings in the GL 3H Bonds, provided such trades were placed prior to 4:00 p.m. eastern standard time on February 1, 2019; this authorization aims to ensure that trades that were placed prior to February 1, 2019, are allowed to settle in the ordinary course, irrespective of whether the sale or transfer is to a non-U.S. person.

Paragraph (c) of this general license previously authorized all transactions and activities prohibited by Subsection 1(a)(iii) of E.O. 13808 or by E.O. 13850, each as amended by E.O. 13857, or by E.O. 13884, including transactions in securities and security derivatives, that were ordinarily incident and necessary to the wind down of financial contracts or other agreements that were entered into prior to 4:00 p.m. eastern standard time on February 1, 2019, involving, or linked to, the GL 3H Bonds. This authorization allowed certain financial contracts and agreements that were entered into prior to February 1, 2019, that involved or were linked to the GL 3H Bonds to be wound down, including resolving the purchase and sale of securities, securities lending, repurchase agreements, and swaps and derivative contracts in securities. This authorization, which was included in prior versions of this general license, expired at 12:01 a.m. eastern daylight time on March 31, 2020. Parties may apply for a specific license to engage in activity previously authorized by paragraph (c) of General License 3H.

Paragraph (d) of General License 3H authorizes all transactions related to, the provision of financing for, and other dealings in bonds that were issued both (i) prior to August 25, 2017 (the effective date of E.O. 13808), and (ii) by U.S. person entities owned or controlled, directly or indirectly, by the Government of Venezuela, other than PDV Holding, Inc., CITGO Holding, Inc., and any of their subsidiaries, that would be prohibited by E.O. 13808 or E.O. 13850, each as amended, or by E.O. 13884.

U.S. persons may continue to hold their interests in the GL 3H Bonds, but are subject to certain restrictions on the sale of those bonds in the secondary market. General License 3H does not generally authorize U.S. persons to purchase or acquire new interests in the GL 3H Bonds, and as a result, such purchases are prohibited absent authorization from OFAC. However, to the extent that divesting or transferring holdings in the GL 3H Bonds from U.S. persons to non-U.S. persons requires engaging in certain GL 3H Bond transactions, such as purchasing or settling purchases of holdings in the GL 3H Bonds, paragraph (a), as described in paragraph (e)(2) of General License 3H authorizes U.S. persons to engage in such transactions. Note: paragraph (a), as described in paragraph (e)(2), of General License 3H does not authorize U.S. persons to purchase or invest in bonds issued by the Government of Venezuela other than GL 3H Bonds.

While non-U.S. persons may continue to deal in the GL 3H Bonds, to the extent transactions involve U.S. persons or the U.S. financial system, such transactions must comply with the terms of General License 3H and may not involve sales of any interests in such bonds to U.S. persons (other than as set forth in GL 3H and as described above) as U.S. persons are largely prohibited from purchasing such interests.

05/12/2020

---

### 663. Does the Secretary of the Treasury's determination on March 22, 2019, that persons operating in the financial sector of the Venezuelan economy may be subject to sanctions pursuant to Executive Order 13850, as amended, mean that all Venezuelan financial institutions have been sanctioned by OFAC as of March 22, 2019, and are now blocked persons?

No. Only those persons listed on OFAC's SDN List, and entities that they own, directly or indirectly, 50 percent or more of, are blocked persons and subject to sanctions pursuant to E.O. 13580, as amended.

03/22/2019

---

### 664. Can U.S. financial institutions process transactions and maintain correspondent accounts in connection with activities authorized under Venezuela General Licenses 4A, 15, 16, 17, and 18?

U.S. financial institutions and U.S. registered money transmitters are authorized to process transactions involving Banco de Venezuela, S.A. Banco Universal (Banco de Venezuela) or Banco Bicentenario del Pueblo, de la Clase Obrera, Mujer y Comunas, Banco Universal C.A. (Banco Bicentenario del Pueblo) for purposes of Venezuela General Licenses 4A, 15, 16, and 17, Banco Prodem S.A. for purposes of General License 17, and Integracion Administradora de Fondos de Ahorro Previsional, S.A. for purposes of General License 18, in each case so long as the underlying transaction or activity is authorized under the relevant general license.

U.S. financial institutions that maintain correspondent accounts for Banco de Venezuela or Banco Bicentenario del Pueblo for purposes of General Licenses 4A, 15, 16, and 17, Banco Prodem S.A. for purposes of General License 17, and Integracion Administradora de Fondos de Ahorro Previsional, S.A. for purposes of General License 18 may debit or credit such accounts for transactions consistent with the activity authorized in the relevant general license.

03/22/2019

---

## 665. Will the designation of the Government of Venezuela restrict the ability of U.S. persons to support humanitarian efforts, including to engage in or facilitate the provision of humanitarian assistance or non-commercial, personal remittances to Venezuela?

No. OFAC is committed to ensuring that humanitarian assistance and non-commercial, personal remittances can flow to the people of Venezuela. To that end, concurrent with the blocking of the Government of Venezuela, OFAC has issued amendments to current Venezuela-related general licenses and issued new general licenses to ensure that U.S. persons may continue to engage in and facilitate non-commercial, personal remittances, and the export or reexport of humanitarian items (agricultural commodities, medicine, medical devices, replacement parts and components for medical devices, and software updates for medical devices) to Venezuela. Likewise, Executive Order 13884 does not prohibit transactions involving the Government of Venezuela that relate to the provision of articles such as food, clothing, and medicine intended to be used to relieve human suffering. For additional information, please see FAQ 519 and OFAC's "Guidance Related to the Provision of Humanitarian Assistance and Support to the Venezuelan People."

OFAC also issued amended General License 20A to authorize official activities of certain international organizations such as the United Nations (including its Programmes and Funds, and its Specialized Agencies and Related Organizations) and the International Committee of the Red Cross, among others, to engage in transactions involving Banco Central de Venezuela, or involving other Government of Venezuela persons to the extent the transactions are subject to U.S. jurisdiction.

Sanctions do not prohibit U.S. persons from engaging in exports or reexports of items to Venezuela, provided that the transactions do not involve sanctioned individuals or entities or certain prohibited activity. Those involved in exports or reexports to Venezuela, including exports or reexports related to activity authorized by OFAC, should also consult the Department of Commerce's Bureau of Industry and Security to ensure eligibility of exportation or reexportation under its authorities.

If individuals, companies, or financial institutions have questions about engaging in or processing transactions related to these authorizations, they can contact OFAC's Sanctions Compliance and Evaluation Division at (800) 540-6322 or (202) 622-2490.

08/06/2019

---

## 672. Can I export or reexport diluents to Venezuela?

No. Diluents (including, for example, crude oil and naphtha) play a key role in the transportation and exportation of Venezuelan petroleum, a primary source of revenue for the illegitimate and corrupt Maduro regime, which the United States seeks to restrict further. OFAC is amending General Licenses (GLs) 7A , 8 , and 13 effective as of June 6, 2019, to restrict U.S. persons engaging in transactions and activities authorized by those GLs from exporting or reexporting diluents, directly or indirectly, to Venezuela, or from engaging in transactions or activities related thereto.

Absent authorization from OFAC, all U.S. persons continue to be prohibited from engaging in any dealings with Petróleos de Venezuela, S.A. (PdVSA), or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest. In addition, non-U.S. persons could be subject to designation pursuant to Executive Order 13850 , as amended, for operating within the oil sector of the Venezuelan economy, or for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of PdVSA, including the exportation or reexportation of diluents to PdVSA.

Given PdVSA's role as Venezuela's state-owned oil company, exports or reexports of diluents to Venezuela likely include a direct or indirect interest of PdVSA. As a result, persons directly or indirectly exporting or reexporting diluents to Venezuela should exercise enhanced due diligence to verify the ultimate end user and ensure that the transaction does not involve a direct or indirect interest of a sanctioned person, including PdVSA, even if the sanctioned person is not identified as a participant in the transaction.

06/06/2019

---

### 679. Executive Order 13884 of August 5, 2019, "Blocking Property of the Government of Venezuela," blocks all property and interests in property of the Government of Venezuela. What does this mean for the Government of the Interim President of Venezuela?

The United States stands with the Venezuelan people and current Interim President of Venezuela Juan Gerardo Guaidó Marquez ("Guaidó") in opposition to the illegitimate Maduro regime.  On January 4, 2021, OFAC issued

General License 31A       authorizing transactions and activities involving the current Interim President of Venezuela, the IV Venezuela National Assembly seated on January 5, 2016 ("IV National Assembly"), and its

Delegated Commission, including respective members and staff, that are otherwise prohibited by E.O. 13884       .

 The authorization also covers transactions and activities prohibited by E.O. 13850       , as amended, with respect to certain persons appointed by Guaidó, the IV National Assembly, and its Delegated Commission.

In addition, General License 31A authorizes transactions and activities involving any official, designee, or representative appointed or designated by Guaidó to act on behalf of the Government of Venezuela, including the Special Attorney General, and any staff of the foregoing individuals; any ambassador or other representative to the United States or to a third country appointed by Guaidó, and any staff of such ambassador or representative; any representative to an international organization appointed by Guaidó, and any staff of such representative; any person appointed by Guaidó to the board of directors (including any ad hoc board of directors) or appointed as an executive officer of a Government of Venezuela entity (including entities owned or controlled, directly or indirectly, by the Government of Venezuela); and any other person that is appointed or designated by any of the foregoing persons to act on behalf of the Government of Venezuela.

General License 31A replaced and superseded General License 31, dated August 5, 2019.

01/04/2021

---

### 680. Does the blocking of the Government of Venezuela impact the ability of U.S. persons to transact with the Government of Venezuela, or persons in which the Government of Venezuela owns, directly or indirectly, a 50 percent or greater interest?

Yes. Unless exempt or authorized by OFAC, all property and interests in property of persons meeting the definition of the Government of Venezuela (see section 6(d) of E.O. 13884 of August 5, 2019) that are in, or come within, the United States or the possession or control of a United States person are blocked, pursuant to E.O. 13884. The term

"Government of Venezuela," as defined in E.O. 13884       , includes the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person

who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.

OFAC has issued several General Licenses (GLs) that provide authorization for categories of persons blocked by E.O. 13884. GL 34A authorizes transactions with certain Government of Venezuela individuals, including United States citizens; permanent resident aliens of the United States; individuals who have a valid U.S. immigrant or nonimmigrant visa, other than individuals in the United States as part of Venezuela's mission to the United Nations; former employees and contractors of the Government of Venezuela; and current employees and contractors of the Government of Venezuela who provide health or education services in Venezuela, including at hospitals, schools, and universities. In addition, GL 22 authorizes certain transactions related to Venezuela's mission to the United Nations, and GL 31 provides authorization related to the Government of the Interim President of Venezuela.

Without authorization from OFAC, U.S. persons are generally prohibited from engaging in transactions with the Government of Venezuela, or persons in which the Government of Venezuela owns, directly or indirectly, a 50 percent or greater interest. U.S. persons are not prohibited from engaging in transactions involving the country or people of Venezuela, provided blocked persons or any conduct prohibited by any other Executive order imposing sanctions measures related to the situation in Venezuela, are not involved.

Please note that persons meeting the definition of Government of Venezuela and persons that are owned, directly or indirectly, 50 percent or more by the Government of Venezuela are blocked pursuant to E.O. 13884, regardless of whether the person appears on the Specially Designated Nationals and Blocked Persons list (SDN List), unless exempt or authorized by OFAC.

As a general matter, OFAC expects financial institutions to conduct due diligence on their own direct customers (including, for example, their ownership structure) to confirm that those customers are not persons whose property and interests in property are blocked. With regard to other types of transactions where a financial institution is acting solely as an intermediary and fails to block transactions involving a sanctions target, OFAC will consider the totality of the circumstances surrounding the bank's processing of the transaction to determine what, if any, regulatory response is appropriate.

11/05/2019

---

### 681. Does General License 28 extend the authorization of wind-down periods that have expired for Petroleos de Venezuela, S.A. (PdVSA), Banco Central de Venezuela (BCV), or other blocked Government of Venezuela persons?

No. General License 28 , "Authorizing Certain Activities Necessary to the Wind Down of Operations or Existing Contracts Involving the Government of Venezuela," only authorizes dealings with persons blocked solely pursuant to E.O. of August 5, 2019; General License 28 does not authorize dealings with persons blocked under E.O.s 13692 or 13850, as amended, or any activities or transactions prohibited under E.O.s 13808, 13827, or 13835, each as amended.

General licenses authorizing wind-down periods for previously designated Government of Venezuela entities (e.g., General License 11 pertaining to PdVSA and General License 19 pertaining to BCV) have expired, and all transactions and activities with such designated persons should have been wound down by the expiration of the applicable general license, absent specific authorization from OFAC.

For clarity on the scope of each general license (including its expiration and the Executive orders or prohibitions the general license authorizes against), please refer to the header of each general license, relevant notes, and any specified expiration date.

1/24/22, 9:00 AM
U.S. Department of the Treasury
Case 1:21-cv-02684-VEC    Document 41-1    Filed 01/28/22    Page 25 of 30
08/06/2019

## 803. What types of activity does General License 35 authorize?

U.S. persons are authorized to engage in certain administrative transactions with the Government of Venezuela that are prohibited by E.O. 13884 of August 5, 2019, where such transactions are necessary and ordinarily incident to such persons' day-to-day operations. General License 35 authorizes U.S. persons to pay taxes, fees, and import duties to the Government of Venezuela, and to purchase or receive permits, licenses, registrations, certifications, and public utility services from the Government of Venezuela, so long as these transactions are necessary and ordinarily incident to such persons' day-to-day operations.

U.S. persons should remain cautious when engaging in authorized activity with blocked persons to ensure all criteria for use of the general license are met. The illegitimate former Maduro regime has a long history of corruption, and we encourage U.S. persons who rely on the authorization in General License 35 to exercise appropriate due diligence to ensure compliance with the terms of the authorization. The U.S. government will continue to target corruption by the illegitimate former Maduro regime. As with any general or specific license, OFAC is prepared to revoke this authorization if appropriate to support U.S. foreign policy and national security priorities.

11/05/2019

## 808. Do I need a specific license from OFAC to file a suit in U.S. court against a person designated or blocked pursuant to Venezuela-related sanctions? Does a U.S. court, or its personnel, need a specific license from OFAC to hear such a case?

No. A specific license from OFAC is not ordinarily required to initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case. However, a specific license from OFAC is required for the entry into a settlement agreement or the enforcement of any lien, judgment, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591). This includes the purported creation or perfection of any legal or equitable interests (including contingent or inchoate interests) in blocked property. While terminology may vary in different jurisdictions and proceedings, a specific license from OFAC would be required for measures such as:

Taking Possession (Actual or Constructive)

• Seizing

• Levying Upon

• Attaching

• Encumbering

• Pledging

• Conveying

• Selling (Final or Contingent)

• Freezing

• Assuming or Maintaining Custody

• Sequestering

For additional information, see 31 C.F.R. §§ 591.309, 591.310, 591.407 and 591.506.

12/09/2019

---

### 809. I hold a writ of attachment on shares of a Government of Venezuela entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations. Am I authorized to prepare for and hold an auction or other sale of the shares, contingent upon the winning bidder obtaining a license from OFAC?

No. Parties who have attached shares of an entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591) must obtain a specific license from OFAC prior to conducting an auction or other sale, including a contingent auction or other sale, or taking other concrete steps in furtherance of an auction or sale. More generally, OFAC urges caution in proceeding with any step in furtherance of measures which might alter or affect blocked property or interests in blocked property. OFAC would consider license applications seeking to authorize such activities on a case-by-case basis. For additional information, see 31 C.F.R. §§ 591.309, 591.310, 591.407 and 591.506.

12/09/2019

---

### 817. What is the significance of OFAC's designations of Rosneft Trading S.A. and TNK Trading International S.A.? Do the E.O. 13850 blocking sanctions on Rosneft Trading S.A. and TNK Trading International S.A. apply to their corporate parent and their affiliates?

On February 18, 2020, OFAC designated Rosneft Trading S.A. pursuant to E.O. 13850 for operating in the oil sector of the Venezuelan economy. Likewise, on March 12, 2020, OFAC designated TNK Trading International S.A. pursuant to E.O. 13850 for operating in the oil sector of the Venezuelan economy.

General License 36A authorizes U.S. persons to engage in certain activities prohibited by E.O. 13850 necessary for the wind down of transactions involving Rosneft Trading S.A. or TNK Trading International S.A., or any entity in which Rosneft Trading S.A. or TNK Trading International S.A. owns, directly or indirectly, a 50 percent or greater interest, through 12:01 a.m. eastern daylight time, May 20, 2020. After the expiration of this authorization, unless exempt or authorized by OFAC, U.S. persons will be prohibited from engaging in transactions with Rosneft Trading S.A. or TNK Trading International S.A., or any entity in which Rosneft Trading, S.A. or TNK Trading International S.A. owns, directly or indirectly, a 50 percent or greater interest, and must block property or interests in property of Rosneft Trading S.A. and TNK Trading International S.A. that are in, or come within, the United States, or the possession or control of a U.S. person. As Rosneft Trading S.A. and TNK Trading International S.A. are also identified on the Sectoral Sanctions Identifications List (SSI List) pursuant to Directives 2 and 4 to E.O. 13662 under the Ukraine-/Russia-related sanctions program, those winding down transactions with Rosneft Trading S.A. or TNK Trading International S.A. should ensure that all activities comply with any applicable Directive 2 and 4 prohibitions, because General License 36A only authorizes certain activities necessary to the wind down of transactions prohibited by E.O. 13850.

The E.O. 13850 blocking sanctions apply only to Rosneft Trading S.A. and TNK Trading International S.A., or any entity in which Rosneft Trading S.A. or TNK Trading International S.A. owns, directly or indirectly, a 50 percent or

greater interest. Blocking sanctions do not apply to these entities' ultimate parent, Rosneft Oil Company. Similarly, blocking sanctions do not apply to Rosneft Oil Company or other subsidiaries or affiliates, provided that such entities are not owned 50 percent or more in the aggregate by one or more blocked persons or otherwise explicitly designated or identified by OFAC.

U.S. persons, therefore, are not prohibited under E.O. 13850 from dealing with Rosneft Oil Company, its non-blocked subsidiaries, or non-blocked affiliates to the extent the proposed dealings do not involve any blocked persons or any other activities prohibited pursuant to any OFAC sanctions authorities. As Rosneft Oil Company, Rosneft Trading S.A., and TNK Trading International S.A. have been listed on the SSI List since July 2014, July 2015, and March 2020 respectively, they are subject to Ukraine-/Russia-related Directives 2 and 4. U.S. persons should be mindful of the relevant Ukraine-/Russia-related prohibitions that would be applicable as a result of dealings with both Rosneft Oil Company, Rosneft Trading S.A., and TNK Trading International S.A. See, generally,FAQs 370-373, 391-396, 405-410, 412-421, and 536-538 for prohibitions on U.S. persons dealing with entities listed on the SSI List. See alsoFAQs 398 and 400 for information regarding dealings with blocked persons representing non-blocked entities.

03/12/2020

---

### 818. Is there a wind-down period for transactions involving Rosneft Trading S.A. or TNK Trading International S.A.?

OFAC issued General License(GL) 36A, which authorizes U.S. persons to engage in certain activities prohibited by E.O. 13850 necessary for the wind down of transactions involving Rosneft Trading S.A. or TNK Trading International S.A., or any entity in which Rosneft Trading S.A. or TNK Trading International S.A., owns, directly or indirectly, a 50 percent or greater interest, through 12:01 a.m. eastern daylight time, May 20, 2020 (a prior version of this GL, GL 36, was issued concurrently with the designation of Rosneft Trading S.A. and authorized certain wind-down activities as well). After the expiration of this authorization, unless exempt or authorized by OFAC, U.S. persons will be prohibited from engaging in transactions with Rosneft Trading S.A. or TNK Trading International S.A., or any entity in which Rosneft Trading S.A. or TNK Trading International S.A. owns, directly or indirectly, a 50 percent or greater interest, and must block property or interests in property of Rosneft Trading S.A. and TNK Trading International S.A. that are in, or come within, the United States, or the possession or control of a U.S. person.

Non-U.S. persons may wind down transactions with Rosneft Trading S.A. or TNK Trading International S.A. without exposure to sanctions under E.O. 13850, provided that such wind-down activity is: (i) consistent with General License 36A; and (ii) completed prior to 12:01 a.m. eastern daylight time, May 20, 2020. Entering into new business involving Rosneft Trading S.A. or TNK Trading International S.A. will not be considered wind-down activity. Non-U.S. persons unable to wind down activities with Rosneft Trading S.A. or TNK Trading International S.A. before 12:01 a.m. eastern daylight time, May 20, 2020, may seek guidance from OFAC.

03/12/2020

---

### 834. What does General License 37 authorize?

On June 18, 2020, OFAC designated pursuant to E.O. 13850, among other entities and individuals, two entities for operating in the oil sector of the Venezuelan economy and identified two vessels owned by these entities as blocked property. Concurrent with this action, OFAC issued General License (GL) 37, which authorizes U.S. persons to engage in transactions and activities prohibited by E.O. 13850, as amended by E.O. 13857 and incorporated into the Venezuela Sanctions Regulations, that are ordinarily incident and necessary to the wind down

of transactions involving the blocked persons or vessels listed in paragraph (b) of GL 37 through 12:01 am eastern daylight time, July 21, 2020.

The wind-down authorization in GL 37 includes, for example, completion of ongoing voyages, including discharge of cargo aboard such vessels as of June 18, 2020; docking or anchoring of the vessels at third-country, non-sanctioned ports; transactions related to the safety and maintenance of the vessels, such as entering into contracts and paying for insurance coverage, flagging, and safety and compliance inspections; and transactions related to the health and safety of any crew, including the provision and processing of wages or other employee benefits, or other provision of crewing services.

After the expiration of this authorization U.S. persons will be prohibited from engaging in all transactions with the persons or vessels listed in paragraph (b) of GL 37 that are not exempt or authorized by OFAC. U.S. persons unable to wind down transactions with the persons or vessels listed in paragraph (b) of GL 37 before 12:01 a.m. eastern daylight time, July 21, 2020, are encouraged to seek guidance from OFAC.

Non-U.S. persons may wind down transactions with the persons or vessels listed in paragraph (b) of GL 37 without exposure to sanctions under E.O. 13850, provided that such wind-down activity is consistent with GL 37. Entering into new contracts involving the persons or vessels listed in paragraph (b) of GL 37 is not authorized under GL 37, unless such contracts are for wind-down activity authorized in paragraph (a). Non-U.S. persons unable to wind down transactions with the persons or vessels listed in paragraph (b) of GL 37 before 12:01 a.m. eastern daylight time, July 21, 2020, are encouraged to seek guidance from OFAC.

06/18/2020

### 854. What does General License 38 authorize?

On November 30, 2020, OFAC designated CEIEC pursuant to Executive Order (E.O.) 13692 for its role in undermining democracy in Venezuela. Concurrent with this action, OFAC issued Venezuela General License (GL) 38 ("Authorizing the Wind Down of Transactions Involving CEIEC") . GL 38 authorizes U.S. persons to engage in all transactions and activities prohibited by E.O. 13692 that are ordinarily incident and necessary to the wind down of transactions and activities involving CEIEC, or any entity in which CEIEC owns, directly or indirectly, a 50 percent or greater interest (collectively, Blocked CEIEC Entities), through 12:01 a.m. eastern standard time, January 14 , 2021.

After the expiration of this authorization, unless exempt or authorized by OFAC, U.S. persons will be prohibited from engaging in transactions with the Blocked CEIEC Entities, and must block property or interests in property of such entities that are in, or come within, the United States, or the possession or control of a U.S. person.

Non-U.S. persons may wind down transactions and activities with the Blocked CEIEC Entities without exposure to sanctions under E.O. 13692, provided that such wind-down activity is: (i) consistent with GL 38; and (ii) completed prior to 12:01 a.m. eastern standard time, January 14, 2021. Entering into new business involving the Blocked CEIEC Entities will not be considered wind-down activity. Non-U.S. persons unable to wind down activities with the Blocked CEIEC Entities before 12:01 a.m. eastern standard time, January 14, 2021, may seek guidance from OFAC.

11/30/2020

### 909. For the purposes of Venezuela General License (GL) 39, what are transactions and activities related to the prevention, diagnosis, or treatment of the Coronavirus Disease 2019 (COVID-19)?

For the purposes of Venezuela GL 39, transactions and activities related to the prevention, diagnosis, or treatment of COVID-19 in Venezuela include, for example:  the export or import of goods and services, and transactions and activities related thereto, in each case that would otherwise be prohibited due to the involvement of the Government of Venezuela, certain blocked financial institutions as described in Venezuela GL 39, or both, provided all conditions and limitations in the GL are satisfied.

COVID-19-related goods or technology include, for example:  medical gowns; medical eye shields and goggles; surgical gloves; face shields; respirators and masks such as N95, N99, and N100 masks; personal hygiene products such as soap and hand sanitizer and other water, sanitation, and hygiene supplies; vaccines and vaccine ingredients or components required for the production of vaccines; equipment, supplies, and containers for transporting, storing, and administering vaccines; personal protective equipment; COVID-19 testing kits and equipment, software and technology for processing such kits; equipment, software, and technology for diagnostic imaging tests; ventilators or components thereof; oxygen tanks and supplies to deliver oxygen; supplies, medicines, or other therapies to treat COVID-19; and field hospitals or mobile medicals units, provided that all conditions and limitations of Venezuela GL 39 are satisfied.

COVID-19-related services include, for example:  treatment of patients with suspected or confirmed COVID-19; training necessary to the safe and effective use of goods for use in connection with the prevention, diagnosis, or treatment of COVID-19; conduct of research into COVID-19; services necessary for the operation, maintenance, or repair of goods for use in connection with the prevention, diagnosis, or treatment of COVID-19; collaboration on the development or enhancement of information related to COVID-19 to the extent not authorized or exempt; development of medical devices or medicines to counteract COVID-19; conduct of clinical studies in connection with COVID-19; provision of public education in connection with COVID-19; disposal of medical waste in connection with COVID-19; water, sanitation, and hygiene promotion materials and supplies, and shelter activities to prevent or treat COVID-19, including Risk Communication and Community Engagement efforts related to COVID-19, and other goods and services, directly related to prevention or treatment of COVID-19; provided all conditions and limitations in Venezuela GL 39 are satisfied.

Other transactions and activities related to the prevention, diagnosis, or treatment of COVID-19 in Venezuela include, for example, when in connection with COVID-19-related goods, technology, or services:  processing and transfer of funds, payment of taxes, fees, and import duties; purchase or receipt of permits, licenses, or public utility services; making of shipping or cargo inspection arrangements; obtaining of insurance; arrangement of financing and payment; shipping of goods; delivery of services; receipt of payment; and entry into contracts (including executory contracts), provided all conditions and limitations in Venezuela GL 39 are satisfied.

As noted in Venezuela GL 39, this general license does not authorize the unblocking of any property blocked pursuant to any part of 31 CFR chapter V, including property of the Government of Venezuela or certain specified blocked financial institutions listed in Venezuela GL 39.

06/17/2021

---

### 914. Do non-U.S. persons risk exposure to U.S. sanctions for engaging in transactions and activities that would be authorized for U.S. persons pursuant to Venezuela General License (GL) 40?

No. Non-U.S. persons would not risk exposure under U.S. sanctions for engaging in activities or facilitating transactions or payments for such activities that would be authorized for U.S. persons pursuant to Venezuela GL 40

.

07/12/2021

---

### 915. For purposes of Venezuela General License (GL) 40, what is liquefied petroleum gas?

For purposes of Venezuela GL 40, the term liquefied petroleum gas refers to the definition provided by the U.S. Energy Information Administration – a group of hydrocarbon gases, primarily propane, normal butane, and isobutane, derived from crude oil refining or natural gas processing. These gases may be marketed individually or mixed. They can be liquefied through pressurization (without requiring cryogenic refrigeration) for convenience of transportation or storage. The definition excludes ethane and olefins.

07/12/2021

---

### 933. Are the authorizations in paragraph (a) of Venezuela-related General Licenses 7C and 20B, respectively, expired?

No.  The authorizations in paragraph (a) of Venezuela-related General Licenses (GLs) 7C ("Authorizing Certain Activities Involving PDV Holding, Inc. and CITGO Holding, Inc.") and 20B ("Authorizing Official Activities of Certain International Organizations Involving the Government of Venezuela"), respectively, have not expired and remain in effect.  The activities described in paragraph (a) of GLs 7C and 20B, respectively, are authorized for an 18-month period, which renews automatically for an additional 18 months on the first day of each month, unless the respective GL is modified or revoked.

In the case of GL 7C, the authorization in paragraph (b), which relates to the purchase and importation of petroleum and petroleum products from Petróleos de Venezuela, S.A., expired on April 28, 2019.  The authorization in GL 7C paragraph (b) does not automatically renew and is no longer in effect.

10/01/2021

---