**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SYRACUSE MOUNTAINS CORPORATION, | Case No.: 1:21-cv-02684-VEC |
| Plaintiff, | |
| v. | ORAL ARGUMENT REQUESTED |
| PETRÓLEOS DE VENEZUELA, S.A. | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE
      DISPUTE ....................................................................................................... 2

      A.    The Parties and the Notes ................................................................... 2

      B.    The UBOs Conspired to Form Syracuse In Order to Sue on the Notes ................ 7

      C.    Syracuse Is Incorporated and Prepares For Litigation .......................... 9

III.  SYRACUSE'S CLAIMS ARE BARRED BY THE DEFENSE OF
      CHAMPERTY ................................................................................................ 11

      A.    Syracuse Took Assignment of the Notes With the Primary Purpose of
            Bringing this Litigation. .................................................................... 11

      B.    The Sole Statutory Exception to Champerty—Transfers Completed in
            Exchange for an Aggregate Purchase Price of at Least $500,000—Does
            Not Apply Here as Syracuse Exchanged Nothing For the Notes ................ 17

IV.   CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Aretakis v. Caesars Ent.*,
No. 16 Civ. 8751 (KPF), 2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018) ..........................12, 13

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*,
94 N.Y.2d 726 (2000) ...........................................................................................................15

*BSC Assocs., LLC v. Leidos, Inc.*,
91 F. Supp. 3d 319 (N.D.N.Y. 2015) ........................................................................12, 15, 16

*Fairchild Hiller Corp. v. McDonnell Douglas Corp.*,
28 N.Y.2d 325 (1971) ...........................................................................................................14

*Justinian Capital SPC ex rel. Blue Heron Segregated Portfolio v. WestLB AG*,
43 Misc. 3d 598 (N.Y. Sup. Ct. 2014) ............................................................................ *passim*

*Justinian Capital SPC v. WestLB AG*,
28 N.Y.3d 160 (2016) ...................................................................................................... *passim*

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
612 F. Supp. 3d 263 (S.D.N.Y. 2020)....................................................................................11

*Semi-Tech Litig., LLC v. Bankers Tr. Co.*,
272 F. Supp. 2d 319 (S.D.N.Y. 2003)....................................................................................11

*Trust for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v. Love Funding Corp.*,
13 N.Y.3d 190 (2009) ......................................................................................................14, 15

**Statutes**

22 U.S.C. § 9702...........................................................................................................................1

N.Y. Jud. Law

§ 489(1)............................................................................................................................11

§ 489(2)..............................................................................................................11, 17, 18

Defendant Petróleos de Venezuela, S.A. ("PDVSA")[1] respectfully submits this
memorandum of law in support of its motion for summary judgment (the "Motion").[2]

## I.    __INTRODUCTION[3]__

To resolve this case, the Court need only look to Plaintiff Syracuse Mountains
Corporation's ("Syracuse") own admissions and a nearly identical 2016 New York Court of
Appeals decision, *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 166-67 (2016)
("*Justinian II*").  Like in *Justinian II*, Syracuse (1) is a shell company created for the purpose of
bringing this litigation, and (2) exchanged nothing of *bona fide* value for the Notes it received,
only a future, pro-rata, promise of any monies obtained from this lawsuit.  Based on these two
undisputed facts, this Court should void the transfers and dismiss Syracuse's claims under New
York champerty law.

---

[1] As this Court may be aware, in 2019 and in response to the Maduro regime's human rights
violations and authoritarian control of Venezuela, the United States recognized the government
of President Juan Guaidó as the legitimate government of Venezuela.  *See* Press Statement,
*Statement from President Donald J. Trump Recognizing Venezuelan National Assembly
President Juan Guaido as the Interim President of Venezuela*, U.S. Dep't of Archives (Jan. 23,
2019), https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-
trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-
venezuela/.  Following the removal of President Guaidó, the United States continues to recognize
the opposition-controlled National Assembly as the only legitimate branch of the Venezuelan
government.  *See* 22 U.S.C. § 9702.  PDVSA appears before this Court at the direction of the
Ad-Hoc Board of PDVSA, appointed by the legitimate National Assembly government.  The
alleged actions and defaults that are the subject of this case all occurred under the dictatorial
regime of Nicolás Maduro.

[2] PDVSA moves for summary judgment on its Seventh Affirmative Defense of champerty.  *See*
Am. Answer ¶ 49 (Dkt. No. 79).  PDVSA reserves all rights with regards to its remaining
affirmative defenses.

[3] Capitalized terms not defined in the Introduction are defined below.

*First*, Syracuse admits it acquired the Notes "just for the purpose of this litigation" in order for the true owners of the Notes (the Shareholders and the UBOs) to "[p]erhaps save money" and maintain anonymity while litigating this action.  This is supported by Syracuse's history: it has none.  Syracuse has no assets or business.  It was created by the UBOs to bring this lawsuit because "it would be easier [to] just have one company to do the work for all of them."  Thus, Syracuse freely admits the primary reason for its existence is to pool Notes from the Shareholders (controlled by the UBOs) in order to efficiently, and anonymously, sue.

*Second*, Syracuse admits the transfer of Notes does not fall within the champerty "safe harbor" for transactions consummated for $500,000 or more.  Syracuse does not claim it paid the Shareholders $500,000, or gave the Shareholders something worth $500,000.  Rather, Syracuse acknowledges it "provided no value in exchange for the Notes."  So why did the Shareholders transfer the Notes?  Because the Shareholders received a pro-rata capital participation in Syracuse.  Indeed, the Shareholders will not receive a single penny from Syracuse until, and *only if*, Syracuse obtains a judgment and enforces that judgment in this case.

Because Syracuse concedes the Note transfers were made for the primary purpose of this litigation and for an aggregate purchase price less than $500,000 (in fact, an aggregate purchase price of zero dollars), this Court should find these transfers champertous as a matter of New York law and grant PDVSA's motion for summary judgment.

## II.    STATEMENT OF MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE

### A.    The Parties and the Notes

PDVSA is the national oil and natural gas company of the Bolivian Republic of Venezuela.  At issue in this litigation are five bond offerings PDVSA made between April 2007 and November 2013.  *See* Compl. ¶ 2 (Dkt. No. 2).

- Pursuant to an indenture dated April 12, 2007 (the "2027 Indenture"), PDVSA issued a series of notes with a total face value of $3 billion and an interest rate of 5.375 percent, maturing on April 12, 2027 (the "2027 Notes").  SOMF ¶ 1[4]; *see also* Broughel Decl. Ex. 1 (2027 Indenture).[5]  The 2027 Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA Petróleo, S.A., as Guarantor, (iii) the Bank of New York, as Trustee, Registrar and Principal Paying Agent, and (iv) the Bank of New York (Luxembourg) S.A., as Luxembourg Listing Agent and Paying Agent.  SOMF ¶ 2; *see also* Broughel Decl. Ex. 1.

- Pursuant to an indenture dated February 17, 2011 (the "2022 Indenture"), PDVSA issued a series of notes with a total face value of $3 billion and an interest rate of 12.75 percent, maturing on February 17, 2022 (the "2022 Notes").  SOMF ¶ 3; *see also* Broughel Decl. Ex. 2 (2022 Indenture).  The 2022 Indenture was entered into among (1) PDVSA, as Issuer, (ii) PDVSA Petróleo, S.A., as Guarantor, (iii) Wilmington Trust Company, as Trustee, (iv) Citibank, N.A., as Registrar, Transfer Agent and Principal Paying Agent, and (v) Dexia Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Listing Agent and Paying Agent. SOMF ¶ 4; *see also* Broughel Decl. Ex. 2.

- Pursuant to an indenture dated November 17, 2011 (the "2021 Indenture"), PDVSA issued a series of notes with a total face value of $2,394,239,600 and an interest rate

---

[4] "SOMF" refers to the Statement of Material Facts in Support of Defendant's Motion for Summary Judgment, dated September 1, 2023, filed in support of the Motion.

[5] "Broughel Decl." refers to the Declaration of Kevin P. Broughel, dated September 1, 2023, and exhibits attached thereto, filed in support of the Motion.

of 9 percent, maturing on November 17, 2021 (the "2021 Notes").  SOMF ¶ 5; *see also* Broughel Decl. Ex. 3 (2021 Indenture).  The 2021 Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA Petróleo, S.A., as Guarantor, (iii) Wilmington Trust Company, as Trustee, (iv) Citibank, N.A., as Registrar, Transfer Agent and Principal Paying Agent, and (v) Dexia Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Listing Agent and Paying Agent. SOMF ¶ 6; *see also* Broughel Decl. Ex. 3.

- Pursuant to an indenture dated May 17, 2012 (the "2035 Indenture"), PDVSA issued a series of notes with a total face value of $3 billion and an interest rate of 9.75 percent, maturing on May 17, 2035 (the "2035 Notes").  SOMF ¶ 7; *see also* Broughel Decl. Ex. 4 (2035 Indenture).  The 2035 Indenture was entered into among PDVSA, as Issuer, (ii) PDVSA Petróleo, S.A., as Guarantor, (iii) Wilmington Trust Company, as Trustee, (iv) Citibank, N.A., as Registrar, Transfer Agent and Principal Paying Agent, and (v) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Listing Agent and Paying Agent.  SOMF ¶ 8; *see also* Broughel Decl. Ex. 4.

- Pursuant to an indenture dated November 15, 2013 (the "2026 Indenture"; collectively with the 2027 Indenture, the 2022 Indenture, the 2021 Indenture, and the 2035 Indenture, the "Indentures"), PDVSA issued a series of notes with a total face value of $4.5 billion and an interest rate of 6 percent, maturing on November 15, 2026 (the "2026 Notes"; collectively with the 2027 Notes, the 2022 Notes, the 2021 Notes, and the 2035 Notes, the "Notes").  SOMF ¶ 9; *see also* Broughel Decl. Ex. 5 (2026 Indenture).  The 2026 Indenture was entered into among (i) PDVSA, as Issuer,

(ii) PDVSA Petróleo, S.A., as Guarantor, (iii) Law Debenture Trust Company of New York, as Trustee, (iv) Citibank, N.A., as Registrar, Transfer Agent and Principal Paying Agent, and (v) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Listing Agent and Paying Agent.  SOMF ¶ 10; *see also* Broughel Decl. Ex. 5.

Under the terms of each of the Notes, the holders are free to assign and transfer the Notes.  SOMF ¶ 11; *see, e.g.*, 2026 Indenture Ex. A at Reverse of Note § 9 ("A Holder may transfer or exchange Notes in accordance with the Indenture.").  Investors are thus able to buy and sell the Notes on the secondary market.  SOMF ¶ 12; *see also* Broughel Decl. Ex. 6 (Dep. Tr. of Breno Cunha) ("30(b)(6) Tr.") 142:2-143:2 ("[A]ll notes are always bought or acquired through secondary market . . . .").

Among the purchasers of Notes are six entities: non-party Titan International Financial Corp. ("Titan"), non-party Albany Investment Capital Ltd. ("Albany"), non-party Samambaia Investments Ltd. ("Samambaia"), non-party Epumal S.A. ("Epumal"), non-party Syoncem Corp. ("Syoncem"), and non-party Mathdav Corp. ("Mathdav," and collectively, the "Shareholders").

- **Titan**: At an unknown point in time, Titan acquired $2 million worth of 2021 Notes, $147.3 million worth of 2022 Notes, and $61.85 million worth of 2035 Notes in the secondary market for the Notes.  SOMF ¶ 13; *see also* Broughel Decl. Ex. 7 (Syracuse Responses and Objections to Interrogatories) at Interrog. No. 2.  The ultimate beneficial owner of Titan is non-party ██████████ ("██████").  SOMF ¶ 15; *see also* Broughel Decl. Ex. 8 (Feb. 9, 2022 Letter Disclosing UBOs).

- **Albany**: At an unknown point in time, Albany acquired $57.5 million worth of 2022 Notes in the secondary market for the Notes.  SOMF ¶ 16; *see also* Broughel Decl.

Ex. 7 at Interrog. No. 2.  The ultimate beneficial owner of Albany is the non-party

██████████████████████ ("██████████").  SOMF ¶ 18; *see also* Broughel

Decl. Ex. 8.

- **Samambaia**: At an unknown point in time, Samambaia acquired $20 million worth

  of 2026 Notes, $28 million worth of 2027 Notes, and $6.8 million worth of 2035

  Notes in the secondary market for the Notes.  SOMF ¶ 19; *see also* Broughel Decl.

  Ex. 7 at Interrog. No. 2.  The ultimate beneficial owner of Samambaia is ████████

  ██████████ ("██████").  SOMF ¶ 21; *see* Broughel Decl. Ex. 8.

- **Epumal**: At an unknown point in time, Epumal acquired $7 million worth of 2022

  Notes in the secondary market for the Notes.  SOMF ¶ 22; *see also* Broughel Decl.

  Ex. 7 at Interrog. No. 2.  The ultimate beneficial owner of Epumal is ████████████

  ("██████████").  SOMF ¶ 24; *see also* Broughel Decl. Ex. 8.

- **Syoncem**: At an unknown point in time, Syoncem acquired $1.35 million worth of

  2022 Notes and $500,000 worth of 2035 Notes in the secondary market for the Notes.

  SOMF ¶ 25; *see also* Broughel Decl. Ex. 7 at Interrog. No. 2.  The ultimate beneficial

  owner of Syoncem is ██████████████████████████ ("████████████").  SOMF

  ¶ 27; *see also* Broughel Decl. Ex. 8.

- **Mathdav**: At an unknown point in time, Mathdav acquired $1 million worth of 2022

  Notes in the secondary market for the Notes.  SOMF ¶ 28; *see also* Broughel Decl.

  Ex. 7 at Interrog. No. 2.  The ultimate beneficial owner of Mathdav is ██████████████

  ██████████ ("██████"; collectively, with ████████████████████████████, and

  ██████████, the "UBOs").  SOMF ¶ 30; *see also* Broughel Decl. Ex. 8.

At the direction of the UBOs, between December 1, 2020 and January 20, 2021, the Shareholders transferred their holdings of Notes to Syracuse[6], a Panamanian shell company.[7]  As of January 20, 2021, Syracuse held $330.3 million in Notes (the "Notes").  SOMF ¶ 57; Broughel Decl. Ex. 7 at Interrog. No. 1.

### B.     The UBOs Conspired to Form Syracuse In Order to Sue on the Notes

In or around August 2020, the UBOs—then the holders of the Notes, via the Shareholders—were interested in making claims against PDVSA under the Notes, but wanted to find a way to both save money and keep their names private.  SOMF ¶ 32; *see generally* Broughel Decl. Ex. 9 (August 2020 Email Chain Introducing the UBOs).  On or around August 15, 2020, Simoni Morato, the Chief Executive Officer of Safra National Bank of New York ("SNBNY"), helped connect the UBOs so they could explore whether it made sense for them to work together in pursuing their claims.  SOMF ¶¶ 33, 36; *see also* Broughel Decl. Ex. 9 at SM000941 ("I explained how you are searching for a law firm and an approach to handle the issue of Venezuela's default and they are interested in talking with you. . . .  I think it would be good for you to talk and try to understand whether it makes sense for you to work together.").  Pedro Luis Cunha Farias—███████████████—advised the UBOs that he and ██ ███████ had been speaking with other similarly-situated noteholders about sharing litigation

---

[6] SOMF ¶¶ 31, 46-56; *see also infra* at I.B.

[7] SOMF ¶ 89; *see also* SOMF ¶¶ 70-89; 30(b)(6) Tr. 29:5-9 ("Q.  All right Does – do I understand correctly that Syracuse doesn't engage in any business activities besides –  A.  No.  Syracuse is just a – has a bank account and notes in custody and that's it.").  Syracuse's only activity to date has been litigation against PDVSA in this case and against the government of Venezuela on other notes in *Syracuse Mountains Corp. v. Bolivian Republic of Venezuela*, Case No. 1:21-cv-02678-AT (S.D.N.Y. Mar. 29, 2021) (default judgment entered on July 20, 2023).

costs and the benefits of forming a group with a large collective face value of notes for leverage in future negotiations.  SOMF ¶ 37; Broughel Decl. Ex. 9 at SM000940.

After further discussions, the UBOs decided to create a new corporate entity to pool the Notes and sue on their claims.  Though the UBOs and/or the Shareholders could have brought their claims on their own without incorporating a new entity, the UBOs believed "it would be easier [to] just have one company to do the work for all of them."  SOMF ¶¶ 38-39; *see also* 30(b)(6) Tr. 18:10-19:9.  Specifically, the UBOs believed litigating through a single entity would "[p]erhaps save money."  SOMF ¶ 40; 30(b)(6) Tr. 18:14-17.  The UBOs also believed that litigating their claims indirectly through a proxy entity would enable them to keep their identities private.  SOMF ¶ 41; *see also* Broughel Decl. Ex. 10 (Dep. Tr. of Pedro Luis Cunha Farias) at 39:13-24 ("Q.  And what did you talk about when evaluating whether it would make sense to form a company?  A.  Basically what was mentioned before in terms of relevance, cost sharing, and also to – a third element, which hasn't been mentioned yet, but privacy.").

On November 17, 2020, the UBOs—via their local counsel in Panama—incorporated Syracuse.  SOMF ¶ 44; Broughel Decl. Ex. 11 (Syracuse Articles of Incorporation).  Shortly thereafter—on December 1, 2020—the UBOs began to transfer their Notes from the Shareholders to Syracuse.  SOMF ¶¶ 46-56; Broughel Decl. Ex. 12 (Spreadsheet Listing Transfers of Notes) at SM000002.  Syracuse received the final transfer on January 20, 2021. SOMF ¶ 56; Broughel Decl. Ex. 12 at SM000003.

Syracuse exchanged no value for the Notes.  *See* SOMF ¶¶ 58-59; Broughel Decl. Ex. 13 (Syracuse Responses to Requests for Admission) at Admission No. 4.  Instead, Syracuse provided each Shareholder with capital participation in Syracuse itself in proportion with its pro rata contribution to the total face value of the Notes.  SOMF ¶ 60; Broughel Decl. Ex. 13 at

Admission No. 4.  Thus, the only value the Shareholders can possibly receive from Syracuse for their Notes is a pro rata portion of any judgment awarded to Syracuse in this action.  *See* SOMF ¶¶ 58-60; Broughel Decl. Ex. 13 at Admission No. 4.

Further, Syracuse did not enter into any written agreement with the UBOs or the Shareholders to govern the terms of the Shareholders' transfer of the Notes to Syracuse.  SOMF ¶¶ 62-63; Broughel Decl. Ex. 13 at Admission No. 1.  The UBOs did not enter into any written agreement to govern the allocation of Syracuse's expenses.  SOMF ¶¶ 64-65; Broughel Decl. Ex. 13 at Admission No. 2.  And the UBOs did not enter into any written agreement that governs the allocation of any proceeds that Syracuse might realize from the Notes.  SOMF ¶¶ 66-67; Broughel Decl. Ex. 13 at Admission No. 3.  Instead, Syracuse and the UBOs simply understood that the Notes do not "belong to Syracuse directly," and that Breno Cunha—Syracuse's formal representative—would "have to respect the [S]hareholders' participation."  30(b)(6) Tr. 143:19-144:2; SOMF ¶¶ 69-70.  To that end, the UBOs agreed to split "all expenses & eventual credits" according to their pro rata contribution to Syracuse's pool of Notes.  SOMF ¶ 68; Broughel Decl. Ex. 14 (Jan. 19, 2021 Email Regarding Sharing of Expenses & Credits) at SNB2907.

### C.    Syracuse Is Incorporated and Prepares For Litigation

The UBOs incorporated Syracuse on November 17, 2020 (SOMF ¶ 44; *see also* Broughel Decl. Ex. 11), and began to transfer their Notes to Syracuse on December 1, 2020.  SOMF ¶ 46; *see also* SOMF ¶¶ 47-56; Broughel Decl. Ex. 12 at SM000002.  By the date of Syracuse's inception, the UBOs had already engaged a law firm, Hughes Hubbard & Reed LLP ("HHR"), to lead this litigation.  SOMF ¶ 92; *see also* Broughel Decl. Ex. 15 (Nov. 17, 2020 Email Regarding Payment of HHR Fees) at SM000981-982 ("Payment of the first phase of HHR (the attorneys leading the litigation).");  Broughel Decl. Ex. 16 (Dec. 1, 2020 Email Updating UBOs After Syracuse's Formation) at SM000955-56 (noting that Syracuse's share issuance structure "was

organized with HHR and it was part of the lawsuit preparation").  By the evening of Syracuse's first day of existence, HHR had already performed $35,000 of work on the "first stage" of this litigation.  SOMF ¶ 93; Broughel Decl. Ex. 15 at SM000982 ("As mentioned, the total for the first phase was $35,346.66, $4,869.69 is Samambaia's portion.").  By December 22, 2020— nearly a full month before Syracuse received its last Notes transfer—HHR was already preparing the complaint for this litigation.  SOMF ¶ 94; Broughel Decl. Ex. 17 (Dec. 22, 2020 Email Regarding Status of Transfers and Litigation Preparation) at SNB2874-75 ("They have formed their team and are starting to prepare the complaints."); *see also* Broughel Decl. Ex. 18 (Jan. 15, 2021 Email Regarding Transfer of Additional Notes) at SNB2900 (email from HHR on January 15, 2021 to ▮▮▮▮▮ assuring him that transferring additional Notes to Syracuse "will be no problem" and that HHR "can continue preparing the complaints and add [them] in before filing").

Once Syracuse received the final set of Notes, it made its final preparations to commence this action.[8]  On February 2, 2021—less than two weeks after the final delivery of Notes— Syracuse mailed demand letters to PDVSA's corporate offices in Caracas, Venezuela.  SOMF ¶ 95; *see also* Broughel Decl. Exs. 19-21 (Demand Letters).  Beyond sending its demand letters, Syracuse had no further correspondence regarding the Notes prior to commencing this action.  SOMF ¶ 96; *see also* 30(b)(6) Tr. 147:8-148:19.  On March 29, 2021, Syracuse filed its complaint.  SOMF ¶ 97; *see also* Compl.  None of the Shareholders nor the UBOs are parties to this case.  SOMF ¶¶ 98-99; *see also* Compl.

---

[8] PDVSA does not concede that any claims under the Indentures validly passed from the Shareholders' to Syracuse when the Notes were transferred.  That issue, however, need not be addressed by the Court in order to hold that any purported transfer by Syracuse is champertous.

III.   **SYRACUSE'S CLAIMS ARE BARRED BY THE DEFENSE OF CHAMPERTY**

New York law recognizes champerty as an affirmative defense, and any claim arising

from a champertous transfer is void.  *See Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 612 F.

Supp. 3d 263, 281 (S.D.N.Y. 2020); *Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 272 F. Supp. 2d

319, 331 (S.D.N.Y. 2003) ("[A]n assignment made in violation of [the champerty] statute is void

and may not be sued upon.").  A transfer is champertous where the transfer was made "with the

intent and for the purpose of bringing an action or proceeding thereon."  N.Y. Jud. Law § 489(1).

The sole statutory exception to champerty is where the transfer had an aggregate purchase price

of at least $500,000.  *Id.* § 489(2).

Here, PDVSA is entitled to summary judgment in its favor and the dismissal of

Syracuse's claims, as Syracuse's acquisition of the Notes was champertous and therefore void.

There is no dispute that the primary purpose of Syracuse acquiring an interest in the Notes from

the Shareholders was for Syracuse to bring this litigation.  Nor is there any dispute that Syracuse

did not pay the Shareholders for the Notes, such that the statutory exception would apply.

A.   **Syracuse Took Assignment of the Notes With the Primary Purpose of Bringing this Litigation.**

The critical inquiry in assessing whether an assignment is champertous under New York

law is whether "'the *primary purpose* . . . behind [the plaintiff's] acquisition of rights'" is "'to

enable [one] to bring a suit . . . .'"  *Justinian II*, 28 N.Y.3d at 166-67 (2016) (quoting *Moses v.

McDivvitt*, 88 N.Y. 62, 65 (1882)) (alterations and emphasis in original).  Though this "primary

purpose" inquiry is "generally a factual question," *Justinian II*, 28 N.Y.3d at 174 (Stein, J.,

dissenting), courts will find a transfer is champertous when the facts are clear.  *See, e.g.*, *id.* at

170-71; *Phoenix Light*, 612 F. Supp. 3d at 282-83.  The undisputed facts establish that

Syracuse's primary purpose in taking assignment of the Notes was to enable it to commence this litigation.

>    1.    *The UBOs Created Syracuse and Transferred the Notes for the Primary Purpose of Bringing This Litigation in Order for the UBOs to Avoid Certain Undesirable Aspects of Litigating This Action Themselves*

Litigation by proxy is indicative of a champertous "primary purpose" under New York law.  *See Justinian Capital SPC ex rel. Blue Heron Segregated Portfolio v. WestLB AG*, 43 Misc. 3d 598, 607 (N.Y. Sup. Ct. 2014) ("*Justinian I*") ("[I]t is champerty to sue . . . for a debt that is not really your own.  [This] is litigation by proxy and prohibited by section 489."), *aff'd* 28 N.Y.3d 160 (2016).  Courts therefore regularly dismiss claims that assignors have transferred to plaintiffs in exchange for a share of any litigation proceeds and/or to avoid certain undesirable consequences of litigating the claims themselves.  *See, e.g.*, *Justinian II*, 28 N.Y.3d 160; *Aretakis v. Caesars Ent.*, No. 16 Civ. 8751 (KPF), 2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018).  This is particularly true in circumstances where the claims are assigned to a shell corporation, created prior to the commencement of the underlying litigation.  *See, e.g.*, *Justinian II*, 28 N.Y.3d 160; *BSC Assocs., LLC v. Leidos, Inc.*, 91 F. Supp. 3d 319 (N.D.N.Y. 2015).

In *Justinian Capital*, the leading case on New York's champerty statute, non-party German bank Deutsche Pfandbriefbank AG ("DPAG") "invested close to € 180 million . . . in notes [that] . . . were sponsored and managed by defendants WestLB."  *Justinian II*, 28 N.Y.3d at 164.  DPAG's investment began to sour, but the German government owned a significant portion of WestLB, and DPAG feared "pursuing a direct action to vindicate its rights" would cause the German government to "withdraw support from DPAG . . . ."  *Id.*  "This fear of repercussions from bringing a direct lawsuit" led DPAG to transfer the notes at issue to Justinian Capital SPC ("Justinian"), "a Cayman Islands shell company with few or no assets" in exchange for

Justinian's contingent promise to remit between 80 and 85 percent of "any proceeds recovered from the lawsuit" back to DPAG. *See id.* at 165-67.[9]

In affirming the trial court's grant of summary judgment in favor of WestLB, the New York Court of Appeals concluded that the lawsuit at issue "was not merely an incidental or secondary purpose of the assignment, but its very essence." *Id.* at 168. The New York Court of Appeals specifically noted that "the impetus for the assignment of the notes to Justinian was DPAG's desire to sue WestLB . . . and not be named as the plaintiff in the lawsuit." *Id.* at 167.

This Court reached a similar conclusion at the motion to dismiss stage in *Aretakis v. Caesars Ent.*, wherein the assignor purportedly transferred his claims against the defendant to avoid "the anxiety, annoyance, frustration and upset caused by" the underlying events. 2018 WL 1069450, at *3. Though the assignor purportedly transferred the "totality" of his interest in the claims, including any claims to the litigation proceeds, to the plaintiff, this Court held that the assignor's desire to avoid certain "predictable responses to litigation" confirmed that the primary purpose "of the assignment was to allow Plaintiff to bring this action" in his place. *Id.* at *10.

In this case, the UBOs created Syracuse so as to "extricate" themselves from certain "predictable responses" to and "repercussions" from litigating this action. Syracuse expressly admitted in its 30(b)(6) deposition that "Syracuse was incorporated just for the purpose of this litigation," to "[p]erhaps save money" and "just have one company to do the work for all of [the UBOs]." SOMF ¶¶ 39-40, 45; 30(b)(6) Tr. 18:10-19:9. Syracuse further admitted that the UBOs had an acute interest in keeping their involvement in any lawsuit private for fear of possible

---

[9] The trial court in *Justinian* further noted that Justinian was a "shell formed exclusively for the purposes of litigating the instant action . . . ." *Justinian I*, 43 Misc. 3d at 606.

"threats against [them] or [their] famil[ies]."  SOMF ¶¶ 41-42; 30(b)(6) Tr. 169:21-171:11

("Nobody wants to expose himself or his family just because of a lawsuit.").[10]

This action is therefore "not merely an incidental or secondary purpose" of the UBOs'

assignment of the Notes to Syracuse, "but its very essence."  *Cf. Justinian II*, 28 N.Y.3d at 168.

The primary purpose of the transfer was to "enable [Syracuse] to bring [this] suit" on the UBOs'

behalf, so that they could prosecute their purported claims at a lower cost and without their

names on the caption.  SOMF ¶¶ 39-43, 45, 71; *cf. Justinian II*, 28 N.Y.3d at 166-67; *see also*

Morato Tr. 50:9-15 ("████████████ caused Titan to transfer [the] bonds, PDVSA bonds to

Syracuse Mountains Corporation . . . for the purpose of the litigation . . . ."); *id.* at 50:22-51:6

("████████ cause[d] [the] PDVSA bonds to be transferred to Syracuse Mountains Corporation

for the purposes of the litigation . . . ."); *id.* at 51:7-19 ("Albany Corporation was transferring

[the] PDVSA bonds to Syracuse Mountains Corporation for the litigation . . . ."); *id.* at 51:20-

52:6 ("Epumal transferred [the] PDVSA notes to Syracuse Mountains Corporation for the

litigation . . . .").  As the undisputed facts reflect that the primary purpose of the transfer was for

litigation, the transfer was champertous and thus void.

> 2.    *To the Extent Syracuse Argues It Has a "Preexisting Propriety Interest"
> in the Notes, the Argument Fails as a Matter of Fact and Law*

Though not specifically enumerated in statute, New York courts will occasionally hold

that an otherwise champertous assignment does not violate New York's champerty statute if the

transferee "holds a preexisting proprietary interest" in the underlying instrument.  *See, e.g.*, *Trust*

---

[10] Other deponents familiar with Syracuse's formation also testified that the UBOs wanted to
pursue their claims from an entity that was not commingled with their other assets.  SOMF ¶ 43;
Broughel Decl. Ex. 22 (Dep. Tr. of Simoni Morato) ("Morato Tr.") 30:11-18 ("When ██████
decided to do the lawsuit he would create an entity that would have the bonds to progress with
the lawsuit and not have his own entity with other assets.").

*for Certificate Holders of Merrill Lynch Mtge. Invs., Inc. Mtge. Pass-Through Certificates, Series 1999-C1 v. Love Funding Corp.*, 13 N.Y.3d 190, 195 (2009).  Such preexisting proprietary interests exist only in isolated and idiosyncratic scenarios, such as where "the acquisition of the claim [is] simply an incidental part of a substantial commercial transaction," *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 330 (1971), or where an entity purchases distressed debt as part of its preexisting business model.  *See Justinian I*, 43 Misc. 3d at 605-06 (citing *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 94 N.Y.2d 726 (2000) (involving distressed debt dealer)).  However, a preexisting propriety interest does not exist where the transferee is merely a newly formed shell corporation that engages in no substantive business activities and whose primary reason for existence is to sue on the assigned claims.  *See, e.g.*, *Justinian I*, 43 Misc. 3d at 606 ("[T]hat is not the situation in the instant case because Justinian, a shell formed exclusively for the purposes of litigating the instant action, did not buy the [] notes. . . . If Justinian were really buying the . . . Notes, it would not be remitting the majority of their value back to the sellers."); *BSC Assocs.*, 91 F. Supp. 3d 319, 328 (finding a shell company did not inherit any preexisting proprietary interest of its predecessor-in-interest).

    *BSC Associates* is instructive.  In that case, the non-party assignor transferred its claims under a government subcontract to the plaintiff, a shell company "formed solely to 'retain'" the underlying claims.  91 F. Supp. 3d at 328.  Though the plaintiff urged the court to view the transfer of assets as the assignor "having retained the claims," the Northern District of New York concluded the plaintiff had failed to identify a "legal mechanism that would permit the Court to disregard Plaintiff's form as a distinct legal entity . . . ."  *Id.* at 327-28.  The Northern District also rejected the plaintiff's contention that the assignment was merely incidental to a legitimate "commercial transaction," because the plaintiff did not acquire any of the assignor's operating

assets; indeed, the plaintiff "only purchased the causes of action previously owned by" the assignor. *Id.* Because the plaintiff "did not exist" when the purported claims accrued and had not acquired the claims as part of a broader acquisition of the assignor's operations, the Northern District held the plaintiff "clearly did not have a proprietary interest in the [claims] underlying [the] action that predates the transfer of claims to Plaintiff," and that only purpose of the assignment was therefore to enable the plaintiff to bring the instant litigation. *Id.* at 328-29.

The decision in *Justinian I* is similarly relevant. There, the Court found the transaction was champertous where Justinian was merely "a shell formed exclusively for the purposes of litigating the instant action." *Justinian I*, 43 Misc. 3d at 606. The Court particularly noted that Justinian did not buy the notes, as "[i]f Justinian were really buying the Class B Notes, it would not be remitting the majority of their value back to the sellers." *Id.* Instead, the seller "effectively controll[ed] the notes—the notes are in a lockbox, [seller] has a perfected security interest in the notes, Justinian cannot sell the notes without [seller's] consent. . ." *Id.* at 607.

Here, Syracuse does not dispute that it is a shell corporation that the UBOs created to receive the Notes at issue here and pursue this litigation. SOMF ¶¶ 45, 72-91; 30(b)(6) Tr. 31:13-16 ("Q. All right. So Syracuse is essentially just a holding company; is that correct, Mr. Cunha? A. Yes."). Syracuse has no employees. SOMF ¶ 78; 30(b)(6) Tr. 22:22-24. Syracuse does not engage in any business activities. SOMF ¶¶ 75-77, 79, 84-85; 30(b)(6) Tr. 29:5-9. Syracuse holds no assets other than the Notes and certain other sovereign debt securities that the UBOs also transferred to Syracuse for the purpose of litigation. SOMF ¶¶ 81-83; 30(b)(6) Tr. 29:10-30:23. Syracuse earns no revenues (SOMF ¶ 86; 30(b)(6) Tr. 21:20-22, 22:5-6), and has no interest in ever doing so. *See* SOMF ¶ 87; 30(b)(6) Tr. 144:6-11 ("Syracuse has no interest in making one cent for anyone from the notes."). The UBOs pay for all of Syracuse's expenses.

SOMF ¶ 88; 30(b)(6) Tr. 32:21-23 ("Q. So Syracuse's funding has come from its shareholders? A. Only."). Syracuse did not buy the Notes. SOMF ¶ 89; *see infra* at III(B). Moreover, Syracuse has no effective control over the Notes—the Notes still solely belong to the Shareholders. SOMF ¶¶ 69-70, 80, 90; 30(b)(6) Tr. 143:19-144:11 (admitting Syracuse is not "able to sell" the Notes because the Notes do not "belong to Syracuse directly" but instead Syracuse must "respect the [S]hareholders' participation."). Finally, Syracuse was only incorporated in November 2020 (SOMF ¶ 44; *see also* Broughel Decl. Ex. 11), and the last of the Notes were transferred to Syracuse's bank account in January 2021. *See* SOMF ¶ 46-56; 30(b)(6) Tr. 13:18-14:5, 140:24-141:9 (confirming that the Notes were transferred to Syracuse around the "beginning of 2021"); Broughel Decl. Ex. 12 at SM000003. It is therefore impossible for Syracuse to have had a preexisting proprietary interest in any claims under the Notes to make the transfer valid.

**B.**     **The Sole Statutory Exception to Champerty—Transfers Completed in Exchange for an Aggregate Purchase Price of at Least $500,000—Does Not Apply Here as Syracuse Exchanged Nothing For the Notes**

New York's champerty statute does not apply to transfers completed in exchange for an aggregate purchase price of at least $500,000. N.Y. Jud. Law § 489(2). The actual remittance of money is not required to satisfy this "safe harbor"; rather, any concrete transfer of value amounting to $500,000 will suffice. *Justinian II*, 28 N.Y.3d at 170 ("Such [an] understanding conforms with the realities of these markets in which payment obligations may be structured in various forms, whether by exchange of funds, forgiveness of a debt, a promissory note, or transfer of other collateral."). The New York Court of Appeals made clear that parties are free to structure the transaction however they like, so long as something valued at $500,000 or more is transferred or pledged as a binding obligation at the time of purchase to the transferor. *Id.* ("We emphasize that we find no problem with parties structuring their agreements to meet the safe

harbor's requirements, so long as the $500,000 threshold is met . . . .").  However, a promise to remit the proceeds of the underlying litigation, if successful, *does not suffice*.  *Id*. at 168.

Syracuse concedes that it paid nothing for the Notes; instead, the UBOs transferred their Notes to Syracuse in exchange for pro rata capital participation in Syracuse itself.  SOMF ¶¶ 58-60; 30(b)(6) Tr. 122:13-17 ("Q.  Did Syracuse pay shareholders for the notes?  A.  No. It was an exchange for capital participation.  Syracuse didn't have any money to pay for any bonds or any notes."); *see also* Broughel Decl. Ex. 13 at Admission No. 4 ("Syracuse admits that, beyond pro rata capital participation in Syracuse, it provided no value in exchange for the Notes received from its shareholders.").

The New York Court of Appeals was explicit in *Justinian II* that this precise arrangement does not satisfy the champerty safe harbor under N.Y. Jud. Law § 489(2).  There, as here, the only "value" Justinian exchanged for DPAG's notes was a contingent promise to remit between 80 and 85 percent of any proceeds Justinian received if it prevailed on DPAG's claims. *Justinian I*, 43 Misc. 3d at 607 ("Justinian paid nothing for the notes; 85% of any verdict or settlement goes back to DPAG . . . .").  In affirming the trial court's award of summary judgment in favor of defendant WestLB, the New York Court of Appeals held that "because Justinian did not . . . have a binding and bona fide obligation to pay the purchase price independent of the successful outcome of the [underlying] lawsuit, Justinian [was] not entitled to the protection of the safe harbor."  *Justinian II*, 28 N.Y.3d at 171.  The New York Court of Appeals proclaimed that "the agreement at issue" was nothing more than "a sham transaction between the owner of a claim which did not want to bring it . . . and an undercapitalized assignee which did not want to assume the $500,000 risk required to qualify for the safe harbor protection of section 489(2)." *Id.*

Just as in *Justinian*, Syracuse did not pay the Shareholders or UBOs for the Notes, but merely provided them a pro-rata share of any award Syracuse obtains in this litigation.  As Syracuse does not qualify for the champerty "safe harbor," and Syracuse admits it obtained the Notes from the Shareholders for the purpose of litigation in order to pool resources and avoid publicity, the transfer of the Notes violates New York's champerty law.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Summary Judgment should be granted.

Dated: September 1, 2023
New York, New York

**PAUL HASTINGS LLP**

 *s/ Kurt W. Hansson*
Kurt W. Hansson
Kevin P. Broughel
James L. Ferguson
Zachary D. Melvin (*application pending*)
200 Park Avenue
New York, New York 10166
Telephone: 212-318-6000
Facsimile: 212-319-4090
kurthansson@paulhastings.com
kevinbroughel@paulhastings.com
jamesferguson@paulhastings.com
zacharymelvin@paulhastings.com

*Counsel for Defendant Petróleos de
Venezuela, S.A.*