UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYRACUSE MOUNTAINS CORPORATION, | |
| Plaintiff, | |
| v. | Civil Action No.: 21-cv-2684-VEC |
| PETRÓLEOS DE VENEZUELA S.A., | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

HUGHES HUBBARD & REED LLP
Daniel H. Weiner
Michael A. DeBernardis
Shayda Vance
One Battery Park Plaza
New York, NY 10004
Tel: 212-837-6000
Fax: 212-422-4726

*Counsel for Plaintiff Syracuse
Mountains Corporation*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

    A.    Formation of Syracuse ........................................................................................ 2

    B.    Syracuse's Acquisition of Sovereign Debt Instruments..................................... 4

    C.    Market Value of the Notes .................................................................................. 5

    D.    Syracuse's Efforts to Enforce the Notes ............................................................ 6

ARGUMENT ............................................................................................................................ 6

I.       PDVSA Fails to Meet Its Burden on Summary Judgment ................................. 6

II.      Syracuse's Acquisition of The Notes Was Not Champertous ........................... 7

    A.    New York's Champerty Statute Is Construed Narrowly..................................... 7

    B.    Litigation was Not the Primary Purpose of Syracuse's Acquisition of the Notes .......... 9

    C.    Syracuse's Acquisition of the Notes Falls within the "Safe Harbor" Provision ............ 14

CONCLUSION........................................................................................................................ 18

## TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................6, 7

*Beazley Ins. Co. Inc. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616 (S.D.N.Y. 2016) ......................8

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 94 N.Y.2d 726 (N.Y. 2000) .............. *passim*

*Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363 (2d Cir. 1999)...........................8, 9, 11

*Fay v. Oxford Health Plan*, 287 F.3d 96 (2d Cir. 2002)..................................................6

*Geris v. DiSilva Taunton Express, Inc.*, No. 07-CV-376-JTC, 2013 WL 3873072
    (W.D.N.Y. July 25, 2013)..............................................................................8

*In re Imax Sec. Litig.*, No. 06 Civ. 6128(NRB), 2011 WL 1487090 (S.D.N.Y.
    April 15, 2011).........................................................................................8

*Jamaica Pub. Serv. Co. v. La Interamericana Compania De Seguros Generales*,
    693 N.Y.S.2d 6 (N.Y. App. Div. 1999) ...............................................................8

*Justinian Cap. SPC ex rel. Blue Heron Segregated Portfolio v. WestLB AG*, 981
    N.Y.S.2d 302 (N.Y. Sup. Ct. 2014), *aff'd*, 10 N.Y.S.3d 41 (N.Y. App. Div.
    2015), *aff'd on other grounds*, 28 N.Y.3d 160 (N.Y. 2016) ....................................12

*Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160 (N.Y. 2016)..................................... *passim*

*Lovati v. Petróleos de Venezuela, S.A.*, No. 1:19-CV-4799 (ALC), 2020 WL
    5849304 (S.D.N.Y. Sept. 30, 2020)...............................................................14

*Mazzini v. Republic of Argentina*, No. 03 CIV. 8120TPG, 2005 WL 743090
    (S.D.N.Y. Mar. 31, 2005), *aff'd*, 282 F. App'x. 907 (2d Cir. 2008) ........................12, 13, 14

*Moses v. McDivitt*, 88 N.Y. 62 (1882).................................................................9

*Richbell Info. Servs., Inc. v. Jupiter Partners*, 723 N.Y.S.2d 134 (N.Y. App. Div.
    2001) ..................................................................................................8

*RSS WFCM2018-C44-NY LOD, LLC v. 1442 Lexington Operating DE LLC*, No.
    21CV4424 (DLC), 2021 WL 5745927 (S.D.N.Y. Dec. 2, 2021), *appeal
    dismissed*, 59 F.4th 586 (2d Cir. 2023)...........................................................13, 14

*Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding
    Corp.*, 13 N.Y.3d 190 (N.Y. 2009) ..........................................................8, 9, 10, 13

*Tr. for Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding
    Corp.*, 591 F.3d 116 (2d Cir. 2010) ...............................................................10

**Statutes and Rules**

Fed. R. Civ. P. 56(a) ................................................................................................6

Fed. R. Civ. P. 56(c) ................................................................................................7

New York Judiciary Law § 489 ............................................................... *passim*

Pursuant to the Court's May 26, 2023 Memorandum Endorsement (Dkt. 119), Plaintiff Syracuse Mountains Corporation ("Syracuse") submits this Opposition to the Motion for Summary Judgment (Dkts. 128, 130) submitted by Defendant Petróleos de Venezuela S.A. ("PDVSA").

## INTRODUCTION

This is a straightforward breach-of-contract case. In 2017, PDVSA ceased making contractually mandated interest and principal payments on various bonds it had issued over the course of approximately six years. In 2020, six private investment companies, each of which owned defaulted PDVSA bonds, transferred their ownership in the bonds to Syracuse, an entity they created in order to enforce their rights under these bonds. The only parties with an interest in Syracuse are the parties that previously owned the PDVSA bonds.

PDVSA now attempts to avoid its express payment obligation by asking this Court to apply the doctrine of champerty, narrowly construed for over a century, in a manner in which it has never been applied to a set of circumstances it was never intended to cover. The doctrine of champerty has always focused on preventing the commercialization of litigation, especially in situations where the relevant claims would not be prosecuted if not transferred. That is not the situation here.

PDVSA relies primarily on one case to support its position that the transfer of the notes to Syracuse was champertous, *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160 (N.Y. 2016) ("*Justinian II*"). However, *Justinian II* is not "nearly identical" to the situation in this case, as PDVSA claims. First, Syracuse did not acquire the PDVSA bonds for the purpose of bringing this litigation. Rather, Syracuse acquired the bonds to enforce its rights as a new owner of those instruments to achieve the greatest possible return for its shareholders. This is a distinction repeatedly recognized by state and federal courts. Second, Syracuse did not acquire narrow

rights to bring claims on these bonds; Syracuse owns the bonds outright.  As rightful owner of

the bonds, Syracuse continues to be harmed by PDVSA's ongoing default.  Third, Syracuse took

steps to enforce the notes prior to bringing this action.  Fourth, Syracuse will not earn one cent

from this litigation, or any other enforcement action, beyond what is contractually due to it and

its founders and shareholders, each of which owned the bonds prior to the default.  In other

words, Syracuse did not acquire the notes to profit from litigation.  Syracuse's acquisition of the

PDVSA bonds simply does not represent the type of commercialization in litigation that the

champerty statute is designed to prevent.

Even if litigation were the primary purpose of Syracuse's acquisition of the notes in

violation of New York Judiciary Law section 489—which it was not—that transaction falls

within New York's champerty "safe harbor" provision.  The safe harbor, which excludes from

Section 489 acquisitions with a purchase price of $500,000 or more, applies to the transfer of any

collateral with a value of more than $500,000.  Syracuse exchanged *bona fide* value for the

PDVSA bonds in the form of unconditional shareholding in Syracuse itself, an entity that, at the

time that shares were transferred, owned debt instruments with a face value exceeding $700

million.  Given these significant holdings, the value of the shares transferred for the PDVSA

notes was well in excess of $500,000, bringing the acquisition within the statutory safe harbor

provision.

## STATEMENT OF FACTS

### A.  <u>Formation of Syracuse</u>

PDVSA entered into a series of indentures dated April 12, 2007 (the "2007 Indenture"),

February 17, 2011 (the "February 2011 Indenture"), November 17, 2011 (the "November 2011

Indenture"), May 17, 2012 (the "2012 Indenture") and November 15, 2013 (the "2013

Indenture") (collectively, the "Indentures").  *See* Plaintiff's Counterstatement and Response to

Defendant's Statement of Material Facts, dated September 29, 2023 ("Counterstatement"), ¶¶ 1-10.  Pursuant to the Indentures, PDVSA issued five bonds that are the subject of this litigation, which include 9.00% notes due in 2021, 12.75% notes due in 2022, 6.00% notes due in 2026, 5.375% notes due in 2027, and 9.75% notes due in 2035 (collectively, the "Notes").  *See id*.

A group of investors—non-parties Titan International Financial Corp. ("Titan"), Albany Investment Capital Ltd. ("Albany"), Samambaia Investments Ltd. ("Samambaia"), Epumal S.A. ("Epumal"), Syoncem Corp. ("Syoncem") and Mathdav Corp. ("Mathdav," and collectively, the "Shareholders"), and their ultimate beneficial owners ("UBOs")—acquired the Notes as well as other bonds issued by PDVSA and the Bolivarian Republic of Venezuela ("Venezuela") in the secondary market.  *See* Counterstatement, ¶¶ 12, 13, 16, 19, 22, 25, 28.  Beginning in late 2017, PDVSA and Venezuela stopped making interest payments—and later principal payments—on the Notes in breach of their contractual obligations.  *See* Counterstatement, ¶ 100.

In or around August 2020, almost three years after these uncured and ongoing breaches started, the Shareholders and UBOs began discussing their options to collectively enforce their rights under the defaulted PDVSA and Venezuela notes.  *See* Counterstatement, ¶ 32.  As a result of those discussions, they formed Syracuse in November 2020 so that the Shareholders could collectively enforce their rights under the Notes.  *See* Counterstatement, ¶¶ 44, 101 (citing Declaration of Shayda Vance in Opposition to Defendant's Motion for Summary Judgment ("Second Vance Decl.") Ex. 7, Farias Tr. at 34:13–35:3 ("Q  . . . And why was Syracuse formed? A  Two reasons, to my understanding. First, it's that *it would make it easier to have an exploration of the bondholders' rights, to enforce the rights*, and the fact that PDVSA had stopped performing.) (emphasis added)); Declaration of Breno Cunha, Dkt. 126 ("Cunha Decl.") ¶ 5.

The Shareholders formed Syracuse in part because the terms of the Indentures encourage pooling of notes by giving additional rights to the holders of a greater percentage of outstanding notes, including acceleration of payments of the principal and accrued interest in the event of default. *See* Counterstatement, ¶¶ 102-105 (citing Second Vance Decl. Ex. 7, Farias Tr. at 34:13–38:17) ("A larger size, to my understanding, makes it easier to enforce your rights as a bondholder . . . That is when you have more – when you have more bond volume, you have additional rights."). The Shareholders also believed that, by combining their notes, they could collectively have a stronger negotiating position in any restructuring discussions with PDVSA. *See* Counterstatement, ¶ 37.[1] The Shareholders further recognized that they could efficiently share costs through collective efforts to enforce their rights under the Notes. *See* Counterstatement, ¶ 40.

## B. Syracuse's Acquisition of Sovereign Debt Instruments

Between December 2020 and January 2021, Syracuse acquired from the Shareholders the Notes with a total face value of $333,300,000, containing the following terms:

| Issue | Identifier | Final Maturity | Indenture | Principal Beneficially Held | Interest Payment Dates |
|---|---|---|---|---|---|
| 9.00% 2021 Notes | CUSIP number P7807HAP0 | 11/17/2021 | November 2011 | $2,000,000.00 | May 17; Nov. 17 |
| 12.75% 2022 Notes | CUSIP number P7807HAM7 | 2/17/2022 | February 2011 | $214,150,000.00 | Feb. 17; Aug. 17 |
| 6.00% 2026 Notes | CUSIP number P7807HAR6 | 11/15/2026 | 2013 | $20,000,000.00 | May 15; Nov. 15 |
| 5.375% 2027 Notes | SEDOL number B1VX673 | 4/12/2027 | 2007 | $28,000,000.00 | Apr. 12; Oct. 12 |
| 9.75% 2035 Notes | CUSIP number P7807HAQ8 | 5/17/2035 | 2012 | $69,150,000.00 | May 17; Nov. 17 |

---

[1] PDVSA acknowledges in its own Statement of Materials Facts (Dkt. 129) that part of the discussion around the formation of Syracuse were the "benefits of forming a group with a large collective face value of notes for leverage in future negotiations with PDVSA." *See also* Counterstatement, ¶ 39 (citing Cunha Decl. ¶ 5 ("The shareholders believed that by combining their notes, they could collectively have a stronger negotiating position in any restructuring discussion with PDSVBA and could efficiently share costs in other efforts to enforce their rights.")).

*See* Counterstatement, ¶ 31 (citing Cunha Decl. ¶ 12).

In addition to the Notes, Syracuse acquired sovereign bonds issued by Venezuela with a total face value of $327,347,000 (*see* Counterstatement, ¶ 108), as well as an additional PDVSA note with $42,738,000 face value maturing on October 27, 2020 (the "PDVSA 2020 Note").  *See* Counterstatement, ¶ 107.  In total, Syracuse acquired debt instruments with a face value totaling $703,385,000 from the Shareholders (collectively, the "Venezuela-related Debt").  *See* Counterstatement, ¶ 109.

In exchange for the Venezuela-related Debt, Syracuse transferred 100% of its shares to the Shareholders.  *See* Counterstatement, ¶ 110.  For each Shareholder that transferred Venezuela-related Debt, Syracuse provided a *pro rata* percentage ownership of Syracuse, which is represented on share certificates duly registered in Panama and held by the Shareholders.  *See* Counterstatement, ¶¶ 111, 112.  Syracuse's transfer of a *pro rata* percentage ownership was not contingent on the outcome of this (or any other) litigation.  *See* Counterstatement, ¶ 89.

### C.  Market Value of the Notes

Syracuse's bank, Safra National Bank of New York, recorded the market (as opposed to face) value of Syracuse's Venezuela-related Debt at nearly $50 million as of January 2021. *See* Counterstatement, ¶ 115.  Market data from FactSet shows the Notes with a price between three and four cents on the dollar during January 2021, the time of the Shareholders' transfer of the shares to Syracuse.  *See* Counterstatement, ¶ 116.  Various news articles and sources have reported PDVSA and Venezuela bonds trading at anywhere from three to ten cents on the dollar against face value after the default in 2017.  *See* Counterstatement, ¶ 117 (citing Second Vance Decl. Exs. 3-5).

**D.  <u>Syracuse's Efforts to Enforce the Notes</u>**

On February 2, 2021, Syracuse mailed demand letters to PDVSA at its offices in Caracas, Venezuela, as well as to the relevant trustees for each of the Indentures ("Demand Letters").  *See* Counterstatement, ¶ 95.  The trustees were Wilmington Trust Company, Bank of New York Mellon Corporation, and Law Debenture Trust Company of New York (collectively, the "Trustees").  *See id*.  The Demand Letters put PDVSA and the Trustees on notice that the Notes were in default and demanded full repayment per the terms of the Indentures.  *See* Counterstatement, ¶ 119.  Neither PDVSA nor the Trustees responded to Syracuse's Demand Letters or gave any indication of an intent to correct the default or engage Syracuse in any manner on its demands.  *See* Counterstatement, ¶¶ 120-121.  On March 21, 2021, approximately seven weeks following the mailing of the Demand Letters, Syracuse filed this action.  *See* Counterstatement, ¶ 122.

## ARGUMENT

**I.    PDVSA Fails to Meet Its Burden on Summary Judgment**

PDVSA has not met its burden in arguing for summary dismissal.  Summary judgment is inappropriate unless "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  A "dispute about a material fact is 'genuine[ ]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

PDVSA presents two material facts supporting a finding of champerty as "undisputed."  PDVSA is incorrect.  First, PDVSA states that "Syracuse [] is a shell company created for the purpose of bringing this litigation[.]"  Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Dkt. 130, ("PDVSA Br.") at 1.  The factual record demonstrates that

Syracuse was **not** formed exclusively for bringing litigation on the Notes; rather, the Shareholders formed Syracuse so they could collectively enforce their rights under the Notes at issue in this action as well as the other notes owned by the Shareholders. *See infra* at 10-11; Counterstatement, ¶ 101; *see also id*. at ¶¶ 69, 90, 91.

Second, PDVSA contends that Syracuse "exchanged nothing of *bona fide* value for the Notes it received[.]" PDVSA Br. at 1. That is false: Syracuse provided more than 40% ownership of Syracuse in exchange for the Notes (the remaining shares of Syracuse were provided to the Shareholders in return for other debt instruments Syracuse acquired). *See infra* at 14-17; Counterstatement, ¶¶ 60, 111. Due to the significant market value of Venezuela-related Debt owned by Syracuse, the shares of Syracuse provided in exchange for the Notes undeniably have *bona fide* value.

Given that PDVSA's contentions contradict the evidence before the Court, PDVSA fails to properly support its summary judgment motion under Federal Rule of Civil Procedure 56(c) and the Court should therefore deny PDVSA's motion. As detailed below, the Court should also find that Syracuse's acquisition of the Notes was not champertous as a matter of law.

II.     **Syracuse's Acquisition of The Notes Was Not Champertous**

   A. <u>**New York's Champerty Statute Is Construed Narrowly**</u>

The doctrine of champerty has ancient roots as a concept to describe "the medieval situation where someone bought an interest in a claim under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded." *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 94 N.Y.2d 726, 734 (N.Y. 2000). The concept evolved to indicate disapproval of lawsuits brought to obtain a profit from the litigation. *See id.* Early New York cases interpreted the prohibition on champerty as "limited in scope" and mainly "directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs," and therefore, New

York's early codifications of the prohibition "were specifically addressed to lawyers[.]" *Id.*; *see also Beazley Ins. Co. Inc. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616, 632 (S.D.N.Y. 2016) ("The prohibition of champerty has always been limited in scope, however, and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs.") (internal quotations omitted).

Like the champerty doctrine in common law, New York's champerty statute, codified in New York Judiciary Law section 489, has been consistently applied narrowly by New York courts. *See Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 372 (2d Cir. 1999); *see also Bluebird*, 94 N.Y.2d at 734–35 ("[W]hile [the New York Court of Appeals] has been willing to find that an action is *not* champertous as a matter of law . . . it has been hesitant to find that an action *is champertous as a matter of law*[.]") (internal citation omitted; emphasis in original); *In re Imax Sec. Litig.*, No. 06 Civ. 6128(NRB), 2011 WL 1487090, at *4 (S.D.N.Y. April 15, 2011) ("In light of this historical background, New York courts have consistently emphasized that the anti-champerty doctrine should be applied narrowly."); *Geris v. DiSilva Taunton Express, Inc.*, No. 07-CV-376-JTC, 2013 WL 3873072, at *10 (W.D.N.Y. July 25, 2013) (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners*, 723 N.Y.S.2d 134, 139 (N.Y. App. Div. 2001)) ("The courts historically have interpreted the proscription of § 489 as a narrow one."). The statute, and the champerty doctrine more broadly, specifically targets the "acquisition of a cause of action by a stranger to the underlying dispute" to speculate and profit from that dispute, *Richbell Info. Servs.*, 723 N.Y.S.2d at 139 (quoting *Jamaica Pub. Serv. Co. v. La Interamericana Compania De Seguros Generales*, 693 N.Y.S.2d 6, 7 (N.Y. App. Div. 1999)), particularly in situations where "claims would not be prosecuted if not stirred up[.]" *Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 199 (N.Y. 2009).

8

In *Moses v. McDivitt*, the seminal case interpreting the champerty statute, the New York Court of Appeals made clear that the purpose of the statute "was to prevent attorneys, etc., from purchasing things in action for the purpose of obtaining costs by the prosecution thereof, and it was not intended to prevent a purchase for the purpose of protecting some other right of the assignee." 88 N.Y. 62, 65 (1882). The Court of Appeals concluded that the language "with the intent and for the purpose" contained in the predecessor champerty statute—and retained in Section 489—meant that, "[t]o constitute the offense [under the statute] the primary purpose of the purchase must be to enable him to bring a suit, and the intent to bring suit must not be merely incidental and contingent." *Id.*; *see also Love Funding Corp.*, 13 N.Y.3d at 199 (endorsing the "distinction between acquiring a thing in action in order to obtain costs and acquiring it in order to protect an independent right of the assignee"); *Elliott Assocs.*, 194 F.3d at 373 ("[T]he mischief Section 489 was intended to remedy did not include the acquisition of debt with the motive of collecting it, notwithstanding that litigation might be a necessary step in the process.").

## B. Litigation was Not the Primary Purpose of Syracuse's Acquisition of the Notes

Whether an acquisition of notes or other debt instruments implicates Section 489 turns on whether the "primary purpose" of the acquisition was to bring a lawsuit (in order to obtain costs) or whether the intent to bring a suit was "merely incidental and contingent." *Elliott Assocs.*, 194 F.3d at 378 (quoting *Moses*, 88 N.Y. at 65). "Primary purpose" in these circumstances has been repeatedly recognized as something akin to "sole purpose." *See Moses*, 88 N.Y. at 65 ("[A] mere intent to bring a suit on a claim purchased does not constitute the offense; the purchase must be made for the very purpose of bringing such suit, and this implies an exclusion of any other purpose."); *Bluebird*, 94 N.Y.2d at 736 ("The bottom line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for *the* purpose (as contrasted to *a* purpose) of

bringing an action or proceeding[.]") (emphasis in original).  When notes are acquired for the purpose of enforcing the newly acquired rights of the assignee, "that is not champerty simply because the [assignee] intends to do so through litigation." *Tr. for Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*, 591 F.3d 116, 120 (2d Cir. 2010) (quoting *Love Funding*, 13 N.Y.3d at 200).  Put another way, in order to be champertous, the lawsuit must be the "very essence" of an assignment, not "merely an incidental or secondary purpose." *Justinian II*, 28 N.Y.3d at 168.

Here, litigation was not the "very essence" of Syracuse's acquisition of the Notes. Rather, Syracuse took assignment of the Notes to effectively and efficiently enforce the Notes, and to be paid in full. *See* Counterstatement, ¶ 101.[2]  That litigation was *not* the primary purpose of the acquisition is evident from two undisputed facts.

First, any recovery of the amounts due on the Notes will be paid in its entirety to the Shareholders, each of which had a pre-existing interest in the Notes.  *See* Counterstatement, ¶ 87. In other words, Syracuse did not bring this action to obtain costs or make money from the litigation.  Courts have consistently interpreted the primary purpose to bring a lawsuit to include an intent to profit from that lawsuit.  *See Love Funding Corp.*, 13 N.Y.3d at 200 (noting a difference "between one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it").  This application is consistent with the primary goal of champerty prohibition to target the commercialization of litigation, as has been recognized for hundreds of years.  *See Justinian II*, 28 N.Y.3d at 163 ("As we have explained, the champerty

---

[2] PDVSA points repeatedly to statements it cherry-picked from Syracuse's 30(b)(6) deposition to infer Syracuse's intent and the intent of the Shareholders.  *See* PDVSA Br. at 8, 13–14.  However, Pedro Farias, whose testimony PDVSA conveniently ignores, testified extensively regarding Syracuse's formation, emphasizing that, from its inception, the Shareholders thought of their rights under the Notes broadly, and that litigation was only one option. *See* Counterstatement, ¶ 101 (citing Second Vance Decl. Ex. 7, Farias Tr. 34:12–35:3; 38:24–40:25).

doctrine was developed 'to prevent or curtail the commercialization of or trading in litigation[.]'"

(quoting *Bluebird*, 94 N.Y.2d at 729).

Second, approximately seven weeks prior to filing the Complaint in this action, Syracuse

mailed the Demand Letters to PDVSA and the Trustees.  *See* Counterstatement, ¶¶ 95, 122.  The

Demand Letters put PDVSA and the Trustees on notice that the Notes were in default, and

demanded full repayment per the terms of the Indentures.  *See* Counterstatement, ¶ 119.

Syracuse only filed the Complaint in this action after receiving no response to the Demand

Letters.  *See* Counterstatement, ¶¶ 120-122.[3]  This action is therefore contingent to Syracuse's

primary purpose, which is to enforce the Notes and be paid in full.  *See Elliott Assocs.*, 194 F.3d

at 378–79 (finding litigation to be contingent to the primary purpose to be paid in full in part

because Elliott sent demand letters prior to filing the action).  This is true even if Syracuse knew

that PDVSA was unlikely to pay in response to the Demand Letters.  *See id*. at 379 ("[T]he fact

that Elliott knew Peru would not, under the circumstances, pay in full [] does not make Elliott's

intent to file suit any less contingent.") (internal quotations omitted).

The facts in this case are readily distinguishable from those in *Justinian II*, on which

PDVSA relies.  Justinian's business plan specifically named litigation as its purpose: "(1)

purchase an investment that has suffered a major loss from a company so that the company does

not need to report such loss on its balance sheet; (2) commence litigation to recover the loss on

the investment[.]" *Justinian II*, 28 N.Y.3d at 164.  Moreover, Justinian's business model—*i.e.*,

to keep a small portion of the proceeds from the litigation as profit and remit the rest to the

---

[3] To the extent PDVSA may claim that sending the Demand Letters was the first step in the litigation process under the "no-action" clauses of the Indentures (*see* Vance Decl. Ex. 2, § 5.1(h); Vance Decl. Exs. 3-6, § 5.01(i)), that door is already closed.  This court has already determined that the pre-suit requirements of the no-action clauses apply to lawsuits to enforce the *Indentures*, and do not apply to this action to enforce the *Notes*.  Dkt. 28 at pp. 2–4 (Opinion & Order on PDVSA's Motion to Dismiss).  Therefore, sending the Demand Letters was not a prerequisite to filing this action and does not reflect a primary intent to litigate.

original claimholder, who was not a Justinian shareholder—was also strong evidence that litigation formed *the* primary purpose of the transfer.  *Id*. at 164–65.  The record in *Justinian II* references no actions that Justinian took to enforce the debt instrument prior to commencing litigation.  Justinian also did not have full control of the notes it acquired; it could not sell the notes, settle the action, or change law firms without consent from DPAG.[4]  *See Justinian Cap. SPC ex rel. Blue Heron Segregated Portfolio v. WestLB AG*, 981 N.Y.S.2d 302, 308 (N.Y. Sup. Ct. 2014), *aff'd*, 10 N.Y.S.3d 41 (N.Y. App. Div. 2015), *aff'd on other grounds*, 28 N.Y.3d 160 (N.Y. 2016).

   Unlike *Justinian II*, Syracuse has not established a business plan that explicitly identifies litigation as its purpose.  Unlike *Justinian II*, Syracuse has full ownership and rights over the Notes.  *See* Counterstatement, ¶¶ 69, 90, 91.  Unlike *Justinian II*, Syracuse did not acquire the Notes in order to profit from litigating the claims.  *See* Counterstatement, ¶ 87.  And, unlike *Justinian II*, Syracuse sent Demand Letters to PDVSA seven weeks prior to initiating this litigation and only filed its Complaint after it received no response.  *See* Counterstatement, ¶¶ 95, 119-122.

   The facts here are far more analogous to certain cases in this district that have found similar transfers non-champertous.  In *Mazzini v. Republic of Argentina*, 03 CIV. 8120TPG, 2005 WL 743090 (S.D.N.Y. Mar. 31, 2005), *aff'd*, 282 F. App'x. 907 (2d Cir. 2008) ("*Mazzini*"), owners of bonds issued by the Republic of Argentina brought suit to recover amounts owed under the bonds' terms following default.  *See id*. at *1.  The Republic of Argentina sought discovery with respect to plaintiffs' ownership of the bonds, alleging that plaintiffs' intent to

---

[4] While Syracuse would likely consult with the Shareholders before taking action with respect to the Notes, *see* PDVSA Br. at 16-17, Syracuse owns the Notes outright without restriction or limitation.  *See* Counterstatement, ¶¶ 69, 90, 91.

litigate constituted a champertous acquisition. *See id.* at *4.  The court rejected *any* discovery regarding champerty because "plaintiffs generally have produced sufficient evidence establishing their ownership of the bonds at issue"[5] and that "[t]he evidence is clear that plaintiffs bought their bonds with the intention of collecting on them, even though they clearly were aware that a lawsuit might be necessary." *Id.*

In *RSS WFCM2018-C44-NY LOD, LLC v. 1442 Lexington Operating DE LLC*, No. 21CV4424 (DLC), 2021 WL 5745927 (S.D.N.Y. Dec. 2, 2021), *appeal dismissed*, 59 F.4th 586 (2d Cir. 2023) ("*1442 Lex*"), the defendants sought discovery to learn whether the plaintiff acquired its interest in a defaulted mortgage and note "as a means of bringing this suit." *Id.* at *3.  The court dismissed the defendants' request for discovery and struck champerty as an affirmative defense, finding that Section 489 "prohibits the purchase of claims 'where such claims would not be prosecuted if not stirred up in an effort to secure costs.'" *Id.* at *3 (quoting *Love Funding*, 13 N.Y.3d at 201).  Because the claim existed long before the lawsuit was filed and there was no indication that the claims would not have been prosecuted if not for an interest in the acquirer of stirring up litigation in order to secure costs, the court struck the affirmative defense of champerty. *Id.*

Like *Mazzini*, it is undisputable here that Syracuse owns the Notes at issue (*see* Counterstatement, ¶¶ 69, 90, 91) and intends to collect what it is owed under the terms of the Notes. *See supra* at 10-12; Counterstatement, ¶ 101.  Like *1442 Lex*, claims under the Notes in this case existed well before the Shareholders' assignment of the Notes to Syracuse, and PDVSA was on notice of its default under the Notes. *See* Counterstatement, ¶¶ 38, 95, 100.  In fact, by

---

[5] The Court was satisfied with proof of ownership, holding that "a properly executed declaration and an account statement will be sufficient to prove that the bonds plaintiffs claim to own are in fact the bonds held in their accounts." *Id.*

the time Syracuse brought this action, other noteholders had already brought actions against PDVSA related to some of the same notes.  *See, e.g., Lovati v. Petróleos de Venezuela, S.A.*, No. 1:19-CV-4799 (ALC), 2020 WL 5849304 (S.D.N.Y. Sept. 30, 2020).  Like *1442 Lex*, Syracuse's claims were not "stirred up in an effort to secure costs."  Like the courts in both *Mazzini* and *1442 Lex*, the Court should find the transfer of the Notes to Syracuse to be non-champertous.

## C. <u>Syracuse's Acquisition of the Notes Falls within the "Safe Harbor" Provision</u>

Even if Syracuse's primary purpose in acquiring the Notes had been to bring this litigation—which it was not—PDVSA's motion for summary judgment should be denied because Syracuse's acquisition of the Notes falls within the "safe harbor" provision in Judiciary Law section 489(2).  Section 489(2) provides that the prohibition on champerty does <u>not</u> apply to any assignment, purchase or transfer of notes or other securities with an "aggregate purchase price of at least five hundred thousand dollars."  N.Y. Jud. Law § 489(2).  It is undisputed that this safe harbor provision "is satisfied by actual payment of at least $500,000 *or the transfer of financial value worth at least $500,000 in exchange for the notes* or other securities."  *Justinian II*, 28 N.Y.3d at 169–170 (emphasis added); *see* PDVSA Br. at 17.  Thus, so long as something valued at $500,000 or more is transferred or pledged in connection with the transfer, the safe harbor applies.  *See Justinian II*, 28 N.Y.3d at 170 ("Such [an] understanding conforms with the realities of these markets in which payment obligations may be structured in various forms, whether by exchange of funds, forgiveness of a debt, a promissory note, *or transfer of other collateral*." (emphasis added)).  Parties are free to structure their transactions specifically to meet the safe harbor's requirements, so long as the $500,000 threshold is met.  *Id*.

Here, Syracuse's acquisition of the Notes falls squarely within the safe harbor provision. In exchange for the Notes and other debt instruments acquired from the Shareholders at the same

time, Syracuse transferred 100% of its shares.  *See* Counterstatement, ¶ 110.  Each party that

transferred Notes to Syracuse received in return a *pro rata* percentage ownership of Syracuse.

*See* Counterstatement, ¶ 111 (citing Cunha Decl. ¶ 4; Declaration of Shayda Vance in Support of

Plaintiff's Motion for Summary Judgment ("Vance Decl.") Ex. 13 (Dkt. 127-13), Cunha 30(b)(6)

Tr. 122:13-16; Second Vance Decl. Ex. 7, Farias Tr. 69:4-8; 89:19-25).  That ownership is

represented on share certificates duly registered in Panama and held by each Shareholder.  *See*

Counterstatement, ¶ 112.

   At the time of the transfer of its shares, Syracuse's assets included (i) the Notes involved

in this litigation, (ii) the PDVSA 2020 Note, and (iii) certain bonds issued by Venezuela.  *See*

Counterstatement, ¶ 112.  In total, Syracuse's Venezuela-related Debt exceeded $700 million at

the time of the share transfer.  *See* Counterstatement, ¶ 109.  The value of Syracuse—and

therefore the value of its shares—was and is based on the value of the Venezuelan-related Debt

that it owns.  *See* Counterstatement, ¶ 114.

   While disagreement may exist about the precise market value of the Venezuelan-related

Debt owned by Syracuse, there is no doubt that the value of those assets was far in excess of

$500,000 at the time of the transfer.  And as a result, the value of Syracuse's shares exchanged

for the Notes and the other Venezuela-related Debt, certainly exceeded the $500,000 safe harbor

threshold.

   Even limiting the analysis to just the Notes at issue, which at the time of Syracuse's

acquisition of its Venezuela-related Debt had a face value of $333,300,000 (approximately

47.4% of the total face value of the Venezuelan-related Debt acquired by Syracuse, *see*

Counterstatement, ¶ 13, 16, 19, 22, 25, 28, 31, 109), the value of the transfer of Syracuse's shares

certainly exceeded the $500,000 safe harbor threshold.  Contemporaneous market pricing data

shows that when Syracuse acquired the Notes (between December 1, 2020 and January 20, 2021), the market value of the Notes fluctuated between 3.25 percent of face value and 3.85 percent of face value.  *See* Counterstatement, ¶ 116 (citing Second Vance Decl. at ¶¶ 8-10; Second Vance Decl. Ex. 2).  Even at a below-market estimate of 3 percent of face value, Syracuse's holdings in the Notes amounted to nearly $10 million at the time of the transfer, given the $333,300,000 face value of the Notes.  As the Notes made up 47.4% of the total face value of Syracuse's Venezuela-related Debt (*see* Counterstatement, ¶¶ 13, 16, 19, 22, 25, 28, 31, 109), Syracuse transferred 47.4% of its shares in return for the Notes.  *See* Counterstatement, ¶ 70.

Adding in Syracuse's other Venezuelan-related Debt, which by face value constituted more than half of Syracuse's holdings,[6] the value of the transfer (and thus the value of Syracuse's shares) certainly exceeded the five hundred-thousand-dollar threshold set forth in N.Y. Judiciary Law section 489(2).  Various news articles report the market price of Venezuelan sovereign debt as ranging from three percent to ten percent of face value after the default in 2017.  *See* Counterstatement, ¶ 117 (citing Second Vance Decl. Exs. 3-6).  Even very conservatively assuming the bottom of that range, Syracuse's other Venezuelan-related Debt would have added another approximately $11.1 million to Syracuse's valuation.[7]

In arguing that the safe harbor should not apply to Syracuse's acquisition of the Notes, PDVSA once again relies on the New York Court of Appeals' decision in *Justinian II*.  *See*

---

[6] Regardless of the relative size of Syracuse's holdings, the market value of Syracuse's other Venezuelan-related Debt was likely higher than the market value of the Notes at the time of the transfer.  *See* Counterstatement, ¶ 117 (citing Second Vance Decl. Ex. 3 ("Bonds issued by Venezuela's government trade near 7% of face value while those issued by state oil company PDVSA fetch around 3%, according to Refinitiv Eikon data.")).

[7] At the time of the transfer of its shares to the Shareholders, Syracuse's holdings of Venezuela sovereign debt had a total face value of $327,347,000, and Syracuse's PDVSA 2020 Note had a $42,738,000 face value.  *See supra* at 4.  Combined, Syracuse's other Venezuelan-related Debt had a total face value of $370,085,000.  Three percent of that total face value would have been $11,102,550.00.

PDVSA Br. at 17–19.  Again, its reliance is misplaced.  In *Justinian II*, in exchange for certain notes owned by the original noteholder (DPAG), Justinian was only obligated to remit a portion of the proceeds Justinian received if it succeeded in its litigation on those notes.  *See Justinian II*, 28 N.Y.3d at 170 ("The agreement was structured so that Justinian did not have to pay the purchase price unless the lawsuit was successful, in litigation or in settlement.").  Justinian did not provide equity in itself, or any other asset or collateral with value, in exchange for its notes. *See id*.  In finding that the arrangement fell outside the safe harbor, the New York Court of Appeals noted in particular that Justinian did not have an obligation to pay for the notes "independent" of the outcome of the litigation.  *See id*. at 171 ("[B]ecause Justinian did not pay the purchase price or have a binding and bona fide obligation to pay the purchase price of the notes independent of the successful outcome of the lawsuit, Justinian is not entitled to the protection of the safe harbor.").  In other words, the only value Justinian exchanged was a contingent promise to remit a portion of the proceeds from litigation.

That is not the case here.  PDVSA asserts that "Syracuse did not pay the shareholders or UBOs for the Notes, but merely provided them a pro-rata share of any award Syracuse obtains in this litigation."  PDVSA Br. at 18.  That is wrong.  In exchange for the Notes, Syracuse provided shares in itself.  *See* Counterstatement, ¶ 111.  Those share transfers were not dependent on the result of this (or any other) litigation, and the value of those shares is not contingent on the results of this action.  *See* Counterstatement, ¶ 89.

Syracuse transferred its shares, worth in excess of $500,000, on a non-contingent basis in exchange for the Notes.  As a result, Syracuse's acquisition of the Notes falls within the safe harbor provision of Section 489(2).

## CONCLUSION

For the reasons stated above, the Court should deny PDVSA's Motion for Summary Judgment and find Syracuse's acquisition of the Notes non-champertous as a matter of law.

Dated: September 29, 2023

<div style="margin-left: 40%;">

Respectfully submitted,

HUGHES HUBBARD & REED LLP

s/
_____
Daniel H. Weiner
One Battery Park Plaza
New York, NY 10004
Tel: 212-837-6000
Fax: 212-422-4726
Email: daniel.weiner@hugheshubbard.com

Michael A. DeBernardis (admitted *pro hac vice*)
Shayda Vance
1775 I Street, N.W.
Washington, D.C. 2006-2401
Tel: 202-721-4678
Fax: 202-729-4678
Email: michael.debernardis@hugheshubbard.com
Email: shayda.vance@hugheshubbard.com

*Counsel for Plaintiff Syracuse Mountains Corporation*

</div>

18