```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/1/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
SYRACUSE MOUNTAINS                          :
CORPORATION,                                :
                                            :
                              Plaintiff,    :
            -against-                       :           21-CV-2684 (VEC)
                                            :
PETRÓLEOS DE VENEZUELA S.A,                 :           OPINION AND ORDER
                                            :
                              Defendant.    :
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Plaintiff Syracuse Mountains Corporation ("Syracuse"), a Panamanian company, brings this breach-of-contract action against Defendant Petróleos de Venezuela S.A. ("PDVSA"),[1] a Venezuelan company, for failing to make payments due on notes issued by PDVSA. The parties have cross-moved for summary judgment. For the reasons discussed below, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED as moot.

## BACKGROUND

Between 2007 and 2013, PDVSA issued fives series of notes pursuant to corresponding indentures (the "Notes"). Def. 56.1 ¶¶ 1–10.[2] At some point after the issuance of the Notes, six non-party entities — Titan International Financial Corp. ("Titan"), Albany Investment Capital Ltd. ("Albany"), Samambaia Investments Ltd. ("Samambaia"), Epumal S.A. ("Epumal"), Syoncem Corp. ("Syoncem"), Mathdav Corp. ("Mathdav," and collectively, the

---

[1]     PDVSA is a capital stock corporation organized under the laws of Venezuela and majority-owned by the Venezuelan government. Pl. 56.1, Dkt. 137 ¶ 4. It is an agency or instrumentality of a foreign state, as defined in 28 U.S.C. § 1603, *id.* ¶ 6, and the Court has jurisdiction under 28 U.S.C. § 1330.

[2]     A comprehensive 56.1 Statement appears under seal at docket entry 150, and the publicly-filed version with redactions appears at docket entry 149. This comprehensive 56.1 Statement is cited as Def. 56.1. All facts are undisputed unless otherwise noted.

1

"Shareholders") — acquired notes in those five series in the secondary market.[3] *Id.* ¶¶ 12–13, 16, 19, 22, 25, 28. Each of the Shareholders has a different ultimate beneficial owner ("UBO"), *id.* ¶¶ 15, 18, 21, 24, 27, 30; the names of the UBOs have been filed under seal pursuant to the Court's September 5, 2023, and October 3, 2023, Orders. *See* Orders, Dkts. 135, 145.

Beginning in November 2017, PDVSA stopped making full payments on the Shareholders' Notes. Def. 56.1 ¶ 100. In August 2020, the UBOs contacted each other to explore legal strategies in response to the PDVSA default and "to exchange ideas and share litigation costs, should [they] enter into litigation." *See* Broughel Decl.,[4] Ex. 9 at 12; *see also* Def. 56.1 ¶¶ 32, 36–37. The UBOs hired the law firm Hughes Hubbard and Reed ("HHR") to explore legal strategies in response to PDVSA's default. Def. 56.1 ¶¶ 92, 118. The Shareholders could have each sued PDVSA under the Notes, *id.* ¶ 38, but the UBOs thought that creating "one company to do the work for all of them" could be easier, save money, and protect their privacy. *Id.* ¶¶ 39–41.

On November 17, 2020, with assistance from HHR and local Panamanian counsel, the Shareholders incorporated Syracuse in Panama. *Id.* ¶¶ 44, 93. The parties dispute vigorously the purpose of Syracuse's incorporation. On the one hand, Defendant asserts that Syracuse was created for the primary purpose of litigating claims against PDVSA. *See* Def. Mem., Dkt. 130 at 14. Defendant cites record evidence that Syracuse was incorporated "to be just one entity to go to New York court." Broughel Decl., Ex. 6 ("30(b)(6) Depo.") at 18:10–19:9. A Syracuse

---

[3] Titan acquired notes with a face value of $211.15 million. *Id.* ¶ 13. Albany acquired notes with a face value of $57.5 million. *Id.* ¶ 16. Samambaia acquired notes with a face value of $54.8 million. *Id.* ¶ 19. Epumal acquired notes with a face value of $7 million. *Id.* ¶ 22. Syoncem acquired notes with a face value of $1.85 million. *Id.* ¶ 25. Mathdav acquired notes with a face value of $1 million. *Id.* ¶ 28.

[4] References to the "Broughel Decl." are to the Declaration of Kevin P. Broughel in Support of PDVSA's Motion for Summary Judgment, which is filed under seal at docket entry 134 and is publicly filed with redactions at docket entry 131.

representative explained that Syracuse's share issuance structure "was organized with HHR" and "part of the lawsuit preparation." Broughel Decl., Ex. 16 at 2. Plaintiff counters that the purpose of creating Syracuse was "to effectively and efficiently enforce the Notes," and litigation was an incidental or secondary purpose to general enforcement. Pl. Opp. Mem., Dkt. 139 at 10.

The Shareholders transferred all of their Notes to Syracuse in a series of transactions in December 2020 and January 2021 (the "Transfers"). Def. 56.1 ¶¶ 46–56. While the Transfers were occurring, HHR had already begun drafting the complaint for this litigation. *Id.* ¶ 94. By January 20, 2021, Syracuse held Notes with an aggregate face value of $330.3 million. *Id.* ¶ 57. The Shareholders also transferred to Syracuse other debt instruments that are not at issue in this litigation. *See id.* ¶¶ 107, 109. Syracuse exchanged no money for the Notes, and it did not enter into any binding obligation with the Shareholders relative to future payments. *Id.* ¶¶ 58–59. Instead, Syracuse provided each Shareholder shares in Syracuse in proportion to its contribution to the total face value of all Notes and other debt instruments transferred. *Id.* ¶ 60. After all the Transfers had been made, the Shareholders collectively owned 100% of Syracuse's shares; each Shareholder held a *pro rata* share of Syracuse equal to its pro rata contribution of Notes (based on their face value). *Id.* ¶¶ 110–11.

Although Syracuse disputes this characterization, its 30(b)(6) representative admitted that Syracuse is essentially a holding company. *See* 30(b)(6) Depo. at 31:8–9 (Q. "So Syracuse is essentially just a holding company; is that correct, . . . ?" A. "Yes."). Syracuse has only six shareholders — the Shareholders described above — and three directors. Def. 56.1 ¶¶ 72–73. It has no salaried employees. *Id.* ¶ 78. The directors perform no day-to-day management of Syracuse, and Syracuse holds no shareholders' or directors' meetings. *Id.* ¶¶ 75–76. Syracuse has no offices and owns no physical property. *Id.* ¶¶ 81–82. It holds no assets other than those

the Shareholders transferred to it.  *Id.* ¶ 83.  It engages in no business activities and earns no money.  *Id.* ¶¶ 84, 86.  It does not even pay its own expenses; those are covered by the Shareholders.  *Id.* ¶ 88.

In February 2021, Syracuse mailed demand letters to PDVSA at its offices in Caracas, Venezuela and to the relevant trustees of each of the Indentures.[5]  *Id.* ¶ 95.  Syracuse received no response and had no further correspondence with PDVSA or any party to the Indentures prior to filing this lawsuit.  *Id.* ¶ 96.  It filed this Complaint on March 29, 2021.  *Id.* ¶ 97; Compl., Dkt. 2.  In May 2021, PDVSA moved to dismiss the Complaint because, it argued, the Indentures contained no-action clauses.  Mot., Dkts. 23–24.  The Court denied the motion to dismiss because the clauses on which PDVSA relied were not so broad as to preclude litigation to enforce the Notes.  *See* Opinion, Dkt. 28.  After a long discovery period, the parties confirmed that discovery was complete.  Letter, Dkt. 120.  The parties then cross-moved for summary judgment.  *See* Mots., Dkts. 123, 128.  Those motions are fully briefed and ripe for the Court's consideration.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record

---

[5] PDVSA contends that Syracuse's demand letters did nothing to put PDVSA on notice of the claims because the letters were sent to PDVSA's Maduro-controlled offices.  *See* Def. 56.1 ¶ 119.  President Guaido was recognized by the United States at that time as the true leader of Venezuela, and the Guaido appointed ad-hoc board that was responsible for PDVSA at that time was not located at the address to which the letters were sent.  *Id.*

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation omitted).

While the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (citation omitted). Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citation omitted). A "scintilla of evidence" is not enough. *Fincher v. Depository Tr.*, 604 F.3d 712, 716 (2d Cir. 2010) (citation omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (a party opposing summary judgment must "specifically respond to the assertion of each purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record").

## II. Defendant is Entitled to Summary Judgment Because the Transfers of Notes to Syracuse Were Champertous

The champerty doctrine "prohibits the purchase of notes, securities, or other instruments or claims with the intent and for the primary purpose of bringing a lawsuit." *Justinian Cap. SPC v. WestLB AG*, 28 N.Y.3d 160, 163 (2016). New York's long-standing ban on champerty is codified in Judiciary Law § 489(1), which states that "no corporation or association, directly or indirectly . . . shall solicit, buy or take assignment of . . . a bond, promissory note, . . . or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." For a transfer of debt securities to be champertous, the transfer's "sole purpose" or

5

"very essence" must be litigation; the assignee's intent to sue cannot be "merely an incidental or secondary purpose of the assignment." *See Justinian*, 28 N.Y.3d at 168.

The champerty doctrine does not apply where the assignee has a "preexisting proprietary interest" in the transferred security. *Tr. for Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp.*, 591 F.3d 116, 120–21 (2d Cir. 2010). New York law distinguishes "between 'acquiring a thing in action in order to obtain costs,' which constitutes champerty, 'and acquiring it in order to protect an independent right of the assignee,' which does not." *Id.* (quoting *Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 199 (2009)). For example, a plaintiff had an "independent interest in pursuing the claims" when it owned 100% of the original purchaser of the assets and was the assignor's junior lender for years before it sued to enforce its rights. *See IKB Int'l S.A. v. Stanley*, 225 A.D.3d 542, 543 (1st Dep't 2024). Barring such an interest and where the assignee is a "stranger" to the underlying dispute, the champerty doctrine applies in fully force. *Id.*; *see also Richbell Info. Servs., Inc. v. Jupiter Partners*, 280 A.D.2d 208, 216 (1st Dep't 2001) (analyzing whether the assignees are strangers or parties seeking to protect their interests).

Champerty is an affirmative defense; the defendant bears the burden of proving that a transfer or purchase of securities was champertous. *See Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 612 F. Supp. 3d 263, 281 (S.D.N.Y. 2020), *aff'd*, No. 20-1312-CV, 2021 WL 4515256 (2d Cir. Oct. 4, 2021). Although the intent and purpose of the assignee is typically a factual question that cannot be decided on summary judgment, a court may grant summary judgment for the defendant where the assignee's purpose is clear from the record and the plaintiff fails to rebut evidence that its purpose in obtaining the assignment was to commence suit. *Id.*

6

A champertous transaction is nonetheless permissible if one of the enumerated safe harbors applies. *Justinian*, 28 N.Y.3d at 164, 168. As Plaintiff urges is relevant here, § 489(2) contains a safe harbor for assignments "having an aggregate purchase price of at least five hundred thousand dollars." The safe harbor protects legitimate purchases of securities accompanied by "a binding and bona fide obligation to pay $500,000 or more for notes or other securities, which is satisfied by actual payment of at least $500,000 or the transfer of financial value worth at least $500,000 in exchange for the notes or other securities." *Justinian*, 28 N.Y.3d at 169–70. The safe harbor, which was intended to exempt legitimate commercial transactions in New York's debt-trading markets from the reach of the champerty statute, *id*. at 169, does not apply to a transfer that "was a sham transaction between the owner of a claim which did not want to bring it . . . and an undercapitalized assignee which did not want to assume the $500,000 risk required to qualify for the safe harbor protection." *Id.* at 171.

**A. Syracuse acquired the Notes for the primary purpose of bringing this litigation**

Construing all facts in Plaintiff's favor, the record evidence demonstrates that Syracuse acquired the Notes for the primary purpose of bringing this litigation. Preparing for a lawsuit was the "very essence," of the Transfers, *Justinian*, 28 N.Y.3d at 168, not merely an incidental consequence. The General Manager of Syracuse, who was Plaintiff's 30(b)(6) witness, admitted that the purpose of Syracuse's existence was to sue on the Notes. When asked "why the shareholders decided to incorporate Syracuse," he responded that "they tried to be just one entity to go to New York Court." 30(b)(6) Depo. at 18:10–13. Counsel immediately followed up, asking: "So Syracuse was incorporated just for the purpose of this litigation?" *Id.* at 18:14–15. He responded, "Yes. Yes. Perhaps save money. It would be easier." *Id.* at 18:16–17.

Contemporaneous emails from November 2020 through January 2021 confirm that Syracuse acquired the Notes to bring this litigation:

7

- On November 17, 2020, the day Syracuse was incorporated, Pedro Farias[6] sent an email discussing the payment of approximately $35,000 in legal fees to HHR; he described the firm as "the attorneys leading the litigation." Broughel Decl., Ex. 15 at 8–9.

- In a December 1, 2020, email, a Syracuse representative characterized the share issuance structure of Syracuse as "part of the lawsuit preparation." Broughel Decl., Ex. 16 at 2.

- In a December 22, 2020, email, a Syracuse representative stated that the attorneys at HHR "have formed their team and are starting to prepare the complaints." Broughel Decl., Ex. 17 at 3.

- On January 15, 2021, a Syracuse representative emailed an HHR attorney about additional notes that one of the Shareholders wanted to include with "those transferred to Syracuse Mountains." Broughel Decl., Ex. 18 at 2. The attorney responded, "That will be no problem. We can continue preparing the complaints and add that in before filing." *Id.* at 1.

- In a January 19, 2021, email, a Syracuse representative provided a general update on the work by HHR, including that an attorney was "working to pull together the Complaint[] for . . . the PDVSA actions." Broughel Decl., Ex. 14 at 3.

Actions speak even louder than words, and Syracuse's actions confirm that it acquired the Notes for the purpose of litigation. Syracuse was incorporated on November 17, 2020 — four months before it filed this lawsuit. Def. 56.1 ¶ 44. It acquired its first Notes two weeks later, on December 1, 2020. *Id.* ¶ 47. During each week of December, Syracuse acquired Notes with face values of millions of dollars. *Id.* ¶¶ 47–55. On January 20, 2021, Syracuse received Notes from Titan; those were the Notes that HHR said on January 15, 2021, it would add to the complaint before filing. *See id.* ¶¶ 3, 56; *see also* Broughel Decl., Ex. 18 at 1. The same day it acquired its last tranche of Notes, Syracuse issued shares to the Shareholders. Def. 56.1 ¶ 61. Syracuse paid the Shareholders no money, nor did it enter into a binding obligation to pay the Shareholders money in the future. *Id.* ¶¶ 58–59. A week and a half after it received the final tranche of Notes

---

[6]     Mr. Farias is not a salaried employee of Syracuse but "handles the expenses for Syracuse." Def. 56.1 ¶ 78.

and issued shares to the Shareholders, Syracuse mailed demand letters to PDVSA's corporate offices in Caracas, Venezuela. *Id.* ¶ 95. Less than two months later, and without attempting to contact PDVSA further, Syracuse filed this lawsuit. *Id.* ¶¶ 96–97. Syracuse's actions confirm its words: it acquired the Notes for the sole purpose of bringing litigation. Based on the evidence in the record, no reasonable factfinder could conclude that the purpose of transferring the Notes was for any purpose other than bringing this action.

Syracuse argues that it "took assignment of the Notes to effectively and efficiently enforce the Notes," and to pay any recovery to the Shareholders, "each of which had a pre-existing interest in the Notes." Pl. Opp. Mem. at 10. But the relevant exception — that the champerty doctrine does not apply to plaintiffs enforcing preexisting rights in a security — is limited to circumstances where the *assignee*, not the *assignor*, has a preexisting right. *See Tr. for Certificate Holders of Merrill Lynch Mortg. Invs., Inc.*, 591 F.3d at 120 (explaining that the champerty doctrine does not apply when the assignee has a "preexisting proprietary interest" in the transferred security). Even though the Shareholders had preexisting rights in the Notes, Syracuse had none. Syracuse is a company created years after the Notes were originally purchased and just months before it sued on the Notes; with this timing, it is impossible for Syracuse to have had a preexisting right. *See, e.g.*, *Sharbat v. Iovance Biotherapeutics, Inc.*, No. 20-CV-1391 (ER), 2023 WL 34377, at *16 (S.D.N.Y. Jan. 4, 2023) (no preexisting interest in an agreement because the plaintiff "was not formed until ten years after the execution" of the agreement); *cf. PDVSA US Litig. Tr. v. Lukoil Pan Americas, LLC*, 991 F.3d 1187, 1196 (11th Cir. 2021) (holding that under New York law, "a new entity created for the purpose of obtaining and litigating" the assigned claims was a "stranger" to the underlying dispute and had no preexisting rights).

Further, Syracuse's argument that it obtained the Notes as part of an effort to enforce them broadly, rather than solely to pursue litigation, is not persuasive. First, it asserts that certain rights under the Indentures were triggered only if noteholders pooled their investments and that pooling investments would increase their bargaining power. Pl. Opp. Mem. at 4; Def. 56.1 ¶¶ 45, 102–05. While it is true that pooling interests has its benefits, the Shareholders could have pooled their interests in the Notes by filing a lawsuit as co-Plaintiffs. The Indentures do not require transfer to a new entity. Def. 56.1 ¶¶ 102–05.

Second, Syracuse claims that, because it took a pre-litigation step to collect on the Notes — it sent demand letters on February 2, 2021 — a reasonable factfinder would not necessarily conclude that litigation was the primary or sole purpose of the Transfers. Pl. Opp. Mem. at 11 (citing *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 378–79 (2d Cir. 1999)). Syracuse's reliance on *Elliott* is misplaced. The plaintiff in *Elliott* bought distressed debt with the purpose of obtaining promised payments from the debtor's reconciliation agent. *Elliott*, 194 F.3d at 367. It followed up by letter about repayment, and counsel participated in a telephone conference call. *Id.* Only after negotiations failed and five more months passed did the plaintiff sue. *Id.* Based on those facts, the district court expressly found that "Elliott's primary goal in investing in Peruvian debt was to be paid in full." *Id.* at 378. Here, the Undersigned cannot make such a finding. The record evidence shows that, unlike in *Elliott*, Syracuse did not buy the Notes. Moreover, between Syracuse's creation and its filing of this lawsuit, Syracuse and its lawyers were focused entirely on litigation, not on negotiating with PDVSA. HHR drafted the complaint, and racked up significant attorneys' fees on litigation tasks, well before sending the demand letters. Although Syracuse makes a creative argument that it intended to resolve its claims without litigation, that argument is belied by the evidence.

10

Overall, the record evidence leads the Court to conclude that no reasonable fact finder could conclude other than that the transfers were made for the purpose of litigation and, therefore, were champertous.

### B. The safe harbor in Judicial Law § 489(2) does not apply

Although the Transfers were champertous, Syracuse argues they are still valid because of the safe harbor in Judicial Law § 489(2). Syracuse's argument fails because it did not pay or obligate itself to provide at least $500,000 of value in exchange for the Notes.

The only thing Syracuse provided to Shareholders in exchange for the Notes were shares in Syracuse. Def. 56.1 ¶¶ 58–60, 110–11. But Syracuse is essentially a holding company. *See* 30(b)(6) Depo. at 31:13–16 (Q. "So Syracuse is essentially just a holding company; is that correct, . . . ?" A. "Yes."). It has no salaried employees, holds no shareholders' or directors' meetings, has no offices, owns no physical property, holds no assets other than those the Shareholders transferred to it, and engages in no business activity. Def. 56.1 ¶¶ 76, 78, 81–84, 86. Exchanging Notes and other debt instruments for shares in a holding company whose only assets are the Notes and debt instruments cannot satisfy the safe harbor's requirement of a $500,000 payment. *See Justinian*, 28 N.Y.3d at 171 (holding that a "sham transaction" between a seller who did not want to bring a claim and a buyer that "did not want to assume the $500,000 risk" does not get the protection of the safe harbor). Other courts have held that transactions are champertous when the seller receives only stock in exchange for the transfer. *See, e.g.*, *Sharbat*, 2023 WL 34377, at *15–17 (holding that assignment was champertous even where the assignors "own[ed] all capital stock in [the assignee]"). The evidence in the record demonstrates, as a matter of law, that Syracuse did not have any "skin in the game," *Justinian*, 28 N.Y.3d at 170, and, therefore, cannot benefit from the protections of the safe harbor.

11

Plaintiff attempts to overcome Defendant's summary judgment motion through reliance on hearsay evidence. *See* Pl. Opp. Mem. at 15–16 (relying on "market pricing data" and "[v]arious news articles"). Based on pricing data obtained from FactSet Research Systems, Inc. and news articles from Reuters and Bloomberg,[7] Plaintiff argues that shares in Syracuse are worth more than $500,000. Vance Declaration, Dkts. 140, 142 ¶¶ 8–13. The data set and articles are hearsay because they are out-of-court statements offered to prove the matter asserted, and no exception to the rule against hearsay applies. Fed. R. Evid. 801(c), 802, 803.[8] Hearsay evidence that fails to satisfy a hearsay exception is inadmissible at trial, and the Court will not consider it in ruling on a motion for summary judgment. *See Porter v. Quarantillo*, 722 F.3d 94, 97, 99 (2d Cir. 2013) (affirming the district court's grant of summary judgment based on its determination that certain evidence was inadmissible hearsay).

Even if the Court were to consider the hearsay evidence, it would not alter the analysis. First, the Notes cannot be exchanged for themselves. The Shareholders previously held the Notes and transferred them, losing the value associated with those Notes. But Plaintiff argues that those very Notes provide the consideration for their transfer. Not so. As proper consideration, the Shareholders must receive something independently valued at $500,000 or more for the safe harbor to apply. Plaintiff's contrary and circular logic would render any

---

[7] Plaintiff relies on the data set and news articles as if they were an expert report on the value of Syracuse's shares. The Court notes that Syracuse had the opportunity to take expert discovery, which would have been subject to a potential *Daubert* challenge, but chose not to do so. *See* Letter, Dkt. 120 (confirming that the parties engaged in no expert discovery).

[8] Plaintiff never offered the Court an applicable exception to the rule against hearsay, but the Court notes that Rule 803(17) — which allows admission of market compilations — is the most likely applicable exception. That exception requires a showing that the compilation is "generally relied on by the public or by persons in particular occupations" to demonstrate that the data is trustworthy and reliable. *See* Fed. R. Evid. 803(17); *see also King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5232454, at *14 (S.D.N.Y. Nov. 9, 2021) (explaining that compilations are considered reliable where the compilers stake their business or public reputations on the accuracy of the compilation). Although Plaintiff's counsel refers to the data as a "reliable and authoritative repository of historical bond pricing data" in her declaration, *see* Vance Decl., Dkts. 140, 142 ¶ 9, Plaintiff has laid insufficient foundation for the Court to rule on its admissibility.

transfer of $500,000 worth of securities automatically free from the champerty bar and render the safe harbor meaningless.  According to the rule urged by Plaintiff, any holder of assets who does not want to sue on its own behalf could engage in a sham transaction to sell those assets to a shell company in exchange for stock in the shell company and circumvent New York's champerty statute.  Second, the value of shares in a company is not equal to the sum of the value of the assets it holds.  *See In re Dissolution of Penepent Corp., Inc.*, 96 N.Y.2d 186, 193 (2001) ("fair value" depends on the circumstances of each case and is meant to capture "what a willing purchaser in an arm's length transaction would offer" (citation omitted)).  Especially here, where the company at issue is a holding company created solely for the purpose of litigation, it is pure speculation what any purchaser would be willing to pay for a share of Syracuse.  Plaintiff's hearsay evidence and speculation cannot overcome Defendant's motion because they do not amount to "specific facts showing that there is a genuine issue for trial."  *Sista*, 445 F.3d at 169 (citation omitted).

*   *   *

Because the primary purpose of the assignment was litigation and the safe harbor does not apply, the transfers were champertous and are void under § 489.  Defendant's motion for summary judgment is GRANTED.

### III.	Plaintiff's Cross-Motion for Summary Judgment is Moot.

As the Court has granted Defendant's motion based on its threshold affirmative defense that the transfers are void, Plaintiff's motion seeking judgment on its breach of contract claims premised on those transfers is moot.  As such, Plaintiff's motion is DENIED.

## CONCLUSION

For the foregoing reason, Defendants' motion for summary judgment at Dkt. 128 is GRANTED in full, and Plaintiff's cross-motion is DENIED as moot. The Clerk of Court is respectfully directed to terminate docket entries 123 and 128 and to close the case.

**SO ORDERED.**

**Date: August 1, 2024**
      **New York, New York**

                                                **VALERIE CAPRONI**
                                                **United States District Judge**